[S. F. No. 2811.    Department One.—June 15, 1903.]

## STEWART LAW AND COLLECTION COMPANY, Respondent, v. F. KRAMBS, Appellant.

CONTRACTS—NEWSPAPER ROUTE—PRICES TO BE AGREED UPON—CONSTRUCTION OF AGREEMENT—MODIFICATION.—Where a contract for a newspaper route provided that the newspaper was to furnish all of the newspapers required for the route at a price to be agreed upon, the contract cannot be construed as giving the rights for all time to make the same profit which was realized upon the first price agreed upon, but is to be construed as meaning that the rates to be charged from time to time should be satisfactory to both parties, and if they could not agree the contract was practically at an end; and where a modified rate was fixed by the newspaper, and the owner of the route continued to receive papers at that rate, yielding a less profit per paper, he must be held to have consented to that modified rate, and to have become liable therefor.

ID.—"DEADHEAD" PAPERS.—Papers furnished without charge to various persons on the route, to advance the interests of the paper and of the route-owner, are not to be charged by the owner of the route to the newspaper at the regular subscription rate, and he is entitled to any profit thereupon.

ID.—EXPENSE INCURRED—AGREEMENT FOR REIMBURSEMENT.—Where it was agreed between the parties that the newspaper company was to reimburse the owner of the route for one half of the expense incurred by him for a carrier on a particular part of the route, the court was not authorized to allow less than one half of such expense.

Id.—ACCOUNT STATED—SUPPORT OF FINDING—CONFLICTING EVIDENCE.
—Where the evidence was conflicting as to whether an account
stated exists between the parties, a finding of the court, that the
statements rendered by the owner of the route were not acquiesced
in by the newspaper company, will not be disturbed upon appeal.

APPEAL from a judgment of the Superior Court of Alameda County and from an order denying a new trial. John Ellsworth, Judge.

The facts are stated in the opinion of the court.

E. M. Gibson, B. F. Woolner, Z. N. Goldsby, and James L. Gallagher, for Appellant.

The evidence shows an account stated, which is a bar to a bill for an account. (Story's Equity Pleading, 798.) There is a receipt on the record showing a settlement and payment to end of January, 1895. When the balance admitted by a stated account is paid, the account is deemed a settled account. (1 Am. & Eng. Ency. of Law, 2d ed., p. 436; Story's Equity Pleadings, 798.) The finding on account of the expense of papers in the Piedmont district is contrary to the only evidence given on the subject. It is impossible to determine from the findings what amount, if any, is due to the Stewart Law and Collection Company, and the case should be remanded for a new trial. (*O'Connor* v. *Frasher,* 53 Cal. 435; *Biddel* v. *Brizzolara,* 56 Cal. 381; *Oneto* v. *Restano,* 78 Cal. 376; *Bull* v. *Bray,* 89 Cal. 288, 292, 293.)

W. B. White, and Reed & Nusbaumer, for Respondent.

The specifications in the new trial statement use the exact language of the finding, and are insufficient. (*Polk* v. *Boggs,* 122 Cal. 115; *De Molera* v. *Martin,* 120 Cal. 544; *McLennan* v. *Wilcox,* 126 Cal. 51; *Kyle* v. *Craig,* 125 Cal. 107.)

ANGELLOTTI, J.—This is an action by the assignees of the Tribune Publishing Company, a corporation, to recover the sum of $1,452.18, a balance alleged to be due on account of newspapers furnished the defendant by said company. Defendant, by his answer, denied the allegation of indebtedness,

alleged a monthly settlement of his accounts with plaintiff's assignor, and also alleged an indebtedness on the part of said assignor in his favor for papers delivered to carriers, for expense of delivering papers in an outlying district, and for papers delivered to deadhead subscribers. Plaintiff had judgment for $977.69. Defendant appeals from the judgment and from an order denying his motion for a new trial.

Defendant is the successor in interest of one Taylor, who, on September 6, 1880, entered into an agreement with William E. Dargie, then the owner and proprietor of the routes of the Oakland Daily Evening Tribune, a newspaper printed and published in the city of Oakland, whereby said Dargie sold and conveyed to Taylor the route for said paper, with the exclusive right to distribute the same within a certain designated territory. The consideration therefor was a certain sum for each *bona fide* subscriber within such district. The agreement contained the following provision, viz.: "And the said Dargie further agrees that he will furnish to said Taylor all of the said newspapers that he will require at and for the price *to be agreed upon* by them." Taylor agreed to pay for all papers monthly the price so to be agreed upon, and to deliver said papers to the regular subscribers thereof to the satisfaction of Dargie. It was provided that the contract should bind the heirs, executors, administrators, and assigns of the respective parties. In 1884, defendant had succeeded to the interest of Taylor in said agreement, as to a portion of the territory embraced thereby, and it was stipulated that on November 1, 1893, the accounts between him and the Tribune Publishing Company balanced. At that time the price of the paper to subscribers was fifty cents per month, and the price paid by defendant was one cent for each paper, or twenty-six cents per month for each subscriber, the average monthly issues of the paper being twenty-six. It does not appear how the rate of one cent per copy was fixed. These prices continued to October 8, 1898.

On October 8, 1898, plaintiff's assignor notified defendant in writing that from and after that date the price of the paper to subscribers would be thirty-five cents per month, and the price to him would be twenty-three cents per month, which would reduce defendant's profit on each subscriber from

twenty-four cents to twelve cents. The defendant objected to any reduction in his profit, but continued to receive the papers and deliver them as before the attempted change in price. He, however, refused to pay for the papers any sum in excess of that which would still leave him his profit of twenty-four cents per month for each subscriber. It was found that from October 8, 1898, to the commencement of this action, there were delivered to defendant 90,701 copies of the paper, and the first question presented by this appeal is as to the price plaintiff's assignor was entitled to receive therefor, the price fixed in the notice of October 8, 1898, or such a price as would still leave defendant the profit he had been theretofore receiving. The trial court found that such papers were delivered under the contract *"as modified by the consent of the parties thereto,* at the price of twenty-three twenty-sixths of one cent per copy."* The finding that the contract was "modified by consent of the parties thereto" is attacked as being unsupported by the evidence, but there is no specification of insufficiency of evidence to sustain the finding that the said papers were sold and delivered at the price of twenty-three twenty-sixths of one cent per copy. There is no evidence to sustain the conclusion of the court below that the contract was modified by consent of the parties, except the fact that defendant, in the face of the notice of change of price, continued to receive the papers. The position of defendant seems to be, that, by his contract, he acquired the right for all time to make a profit of twenty-four cents per month on each subscriber, and that so long as the price to each subscriber was not reduced below twenty-four cents he could continue to receive the papers and retain that amount; that the contract' was in effect one for services on his part, and his compensation was to be twenty-four cents per month per subscriber. The agreement cannot be so construed. The original contract did not fix either the rate to be charged subscribers, or the amount that the owner of the route was to pay for the papers furnished him. Nor did it specify that the route-owner was to receive any designated profit on the papers handled by him, which it would certainly have done had the intention of the parties been as contended by defendant. It appears to have

CXXXIX. Cal.— 21

been recognized by the parties that these were matters that could not well be fixed permanently by the contract, for the reason that changes in the conditions might necessitate changes both in the subcription rate and in the price to be paid by the route-owner. Therefore, no provision of this kind was inserted, and the matter was left open. It appears that, in some way undisclosed by the evidence, the minds of the parties subsequently met upon the rate of one cent per copy, for that was the price charged and paid for several years. That fact, however, did not establish a rate binding for all time. If it had been the intention that the rate first fixed should be permanent, it would naturally have been specified in the contract, and the only apparent reason that it was not specified was, that it was to be subject to change. It is true that Dargie agreed that he would furnish all the papers that might be required "at and for the *price to be agreed upon by them*"; but, considering the nature of this contract and all the provisions thereof, this meant no more than that the rates to be charged from time to time should be satisfactory to both parties, *and that he would furnish all papers that the route-owner might require for his business at such rates.* There is nothing in the agreement that required Dargie to continue to furnish papers at a rate that was not acceptable to him, and nothing that required the route-owner to continue to receive papers at a rate that was not acceptable to him. Under this contract, if the parties could not agree as to the price to be paid for the papers, the agreement was practically at an end. So long as the route-owner paid a price that was satisfactory to Dargie and his successor, the Tribune Publishing Company, and performed the other terms of his contract, and the contract remained unrevoked, he was entitled to retain the privileges granted by the contract, and the agreement has no other effect. When he continued to receive the papers in the face of the notice that the price to him was twenty-three twenty-sixths of one cent per copy, he must be held to have consented to that rate and to have become liable therefor.

2. Between the first day of November, 1893, and the commencement of this action, defendant, acting under the instructions of the Tribune Publishing Company, delivered a large number of papers to various persons, without collecting

from such persons. These papers were known and designated by and between the parties as "deadheads." At first such papers were not charged against defendant at all, but for several years prior to the commencement of this action the papers so furnished him for such delivery were charged against him, with the other papers furnished, and the court allowed him, as a credit on account thereof, the price charged him for the papers, adopting the theory of plaintiff that defendant was not entitled to any profit thereon. Defendant's contention was, that he was entitled to collect the regular subscription rate therefor from the Tribune Publishing Company. It does not appear in the record what the object of this free delivery was; but it is a matter of common knowledge that proprietors of newspapers frequently adopt this method of making their papers known, and used to increase their circulation, a method designed to advance the interests of both the paper and the route-owners. The agreement between the parties is entirely silent as to this matter. It is hardly reasonable to suppose that either party thought that the Tribune Publishing Company would pay defendant full subscription rates for such service. It appears that during the later years defendant made the claim that he was entitled to such rate, but the trial judge was fully justified in finding that such claim was never assented to by the Tribune Publishing Company, and that defendant should be allowed on account thereof simply the amount charged against him therefor.

3. The defendant claimed an offset of $133 for expense incurred in delivering papers in what is called the Piedmont District. While this was a part of defendant's route, and defendant was therefore obligated to deliver papers therein, it was entirely competent for the parties to make a special arrangement as to prices in regard thereto. According to the testimony, there were for some time only thirteen subscribers therein, and the testimony of defendant that there was an arrangement between him and the Tribune Publishing Company, under which the company was to reimburse him to the extent of one half the amount paid by him for a Piedmont carrier and the whole of the car-fare, is uncontradicted. Such an arrangement would entitle him to at least $5.60 per month, as the testimony shows, and there was no attempt to dispute

the claim of defendant that such arrangement continued from November 1, 1893, to December 1, 1895. The court found that defendant was entitled to only thirty-six dollars for his service, but upon what theory that conclusion was reached does not appear. If defendant was entitled to anything on this item, he was, under the undisputed testimony, entitled to the full amount claimed. This finding of the court is not sustained by the evidence.

4. The court further found that the allegation of the answer that defendant furnished monthly to the Tribune Publishing Company a correct statement of account, which was received by such company without objection of any kind, and was acquiesced in and assented to by it, is not true. We cannot say that there was not evidence to support the finding that such statements were not acquiesced in and assented to by the Tribune Publishing Company. While many of the receipts in evidence contained a recital that the money was received on account of a particular month, there was evidence that defendant, when making a payment, often said that he wanted to pay it on some particular month, and on many occasions the recital was inserted for that reason. But the monthly statements, with the exception of two, are not in the record, and it is impossible to ascertain whether the amounts so paid on any particular month constituted the full amount due for that month. The recital in the receipt of February 9, 1895, of "Jan'y account," specially relied on, has no special significance. It is not materially different from "Account January," or "On account January." Many of the receipts were simply "on account." There was evidence that on some occasions he asked for a receipt in full, and was refused it; that on other occasions he was told that the statements would not be accepted; that he was told that the charge for "deadheads," which he testified was always included in the statements, though the same does not appear in either of the two statements in evidence, would not be accepted; and that, finally, he was refused receipts purporting to be on account of any particular month. The evidence on the question of stated account may well be said to be conflicting.

The insufficiency of the evidence to sustain the finding of the court as to the amount due defendant on account of the

Piedmont District will necessitate a new trial, unless plaintiff will consent to a modification of the judgment by reducing the same by ninety-seven dollars.

It is ordered that the judgment be reversed and the cause remanded for a new trial, provided that if the plaintiff, within thirty days after the going down of the *remittitur*, file its consent to the entry of judgment in its favor for $880.69 and $192.05 costs, no new trial shall be had, and in that event the lower court shall enter judgment accordingly.

Shaw, J., and Van Dyke, J., concurred.

Hearing in Bank denied.