BARBARA SANFORD *et al. v.* THE FIRST CITY COMPANY *et al.*

(No. 8541)

Submitted May 11, 1937. Decided June 8, 1937.

*Cowden & Cowden* and *Peyton, Winters & Hereford,* for appellants.

*Hogsett & Smith,* for appellees.

KENNA, PRESIDENT:

By their bill of complaint filed in the Court of Common Pleas of Cabell County the plaintiffs, Barbara Sanford, William D. Sanford, and Cora Gibson, as the owners of Lot 11, Block 120 in the City of Huntington, sought to compel the defendants, The First City Company, Huntington Realty Corporation, C. & D. Company and Jackson Building & Loan Association, to transfer to them a wall constructed along the east line of that lot and covering a strip of land seven and three-fourths inches wide lying immediately outside the east line of Lot 11, and to construct a building wall upon Lot 11 and along its west line as well as to remove an interior partition wall standing entirely upon Lot 11 in a building that covers Lots 10 and 11 in Block 120. Each of the lots fronts thirty feet on Third Avenue and extends back a distance of one hundred sixty feet. The building now standing is approximately sixty feet wide and covers Lots 10 and 11 to their full depth of one hundred sixty feet, having its western wall entirely on Lot 10 touching and parallel with its western property line, and its eastern wall on the seven and three-fourths-inch strip lying just east of the eastern line of Lot 11.

The suit was for the purpose of compelling performance of a building covenant contained in a twenty-year lease for Lot 11 dated December 10, 1919, from Nathan Sanford, immediate predecessor in title of the plaintiffs, to Azel Meadows, whom, the plaintiffs allege, the defendants succeed in title and to the obligation of the covenant, by which Azel Meadows bound himself and his assigns

"as additional rental" to "erect a brick building on said lot, 30x100 feet two-story front and pay for the same, said building to begin May 1, 1920." The bill of complaint contained the usual prayer for general relief.

The cause was transferred to the Circuit Court of Cabell County and there proceeded, after proof, to a final decree denying to the plaintiffs the relief prayed for, and from that decree they prosecute this appeal.

The showing depended upon by the plaintiffs below to entitle them to the relief sought by their bill of complaint is as follows:

On December 10, 1919, Nathan Sanford, since deceased, with the plaintiffs surviving him as his sole heirs-at-law, leased Lot 11 to Azel Meadows. By the terms of the lease the lessee covenanted to pay a rental of sixty dollars per month for the term of twenty years from January 1, 1920, and, by way of and as additional rental or consideration, "to erect a brick building on said lot 30 x 100 feet two story front", the erection whereof was to start May 1, 1920. The lease contained an option under which the lessee might purchase the lot for $35,000.00 at any time during the term.

On March 12, 1920, Azel Meadows obtained a lease from Lucy Van Bibber covering Lot 10, adjoining Lot 11 on the west, and in that lease, by the use of language almost identical with that used in the Sanford lease, Meadows covenanted that he would, within four years from the first day of April, 1920, erect upon Lot 10 a two-story brick building thirty by ninety feet. This lease also contained an option to the lessee to purchase, the price to be $20,000.00.

Meadows, the lessee in both of the leases just described, did not erect separate buildings upon each of the lots in conformity to the separate covenants. Instead, he constructed a building fronting approximately sixty feet on Third Avenue covering both lots and divided it into three storerooms, each approximately twenty feet wide, so that one storeroom and one-half of the middle storeroom (with a variation of some seven and three-fourths inches on account of the wall arrangement hereinafter de-

scribed) lies within the confines of each of the two lots. A three-story building had theretofore been erected upon Lot 12, and its western wall, for the purposes of this case, may be regarded as extending along the eastern line of Lot 11 for its entire depth. Rather than construct a new wall for the building that he intended to build, Meadows purchased outright from the owners of Lot 12 the seven and three-fourths-inch strip lying east of and along the eastern boundary line of Lot 11 with the wall standing on it. It will be observed that this arrangement caused the eastern wall of his building to be entirely outside the property line of Lot 11. It will further be observed that, whereas Meadows' covenant required him to place on Lot 11 a building one hundred feet deep, the building which he constructed under this arrangement was in fact one hundred sixty feet deep. In the construction of his sixty-foot-front building, Meadows built the western wall entirely upon Lot 10 and along its western line. This wall, instead of being ninety feet deep, as his covenant with Lucy Van Bibber required, was built by Meadows one hundred and sixty feet deep. The building was completed sometime after June 15, 1920, since the deed granting to Meadows the seven and three-fourths-inch strip bears that date.

The proof does not disclose that this arrangement by which Meadows departed from his undertakings to construct separate buildings upon Lots 10 and 11 was ever made a matter of express agreement between him and Nathan Sanford, who was then living, but we think that the circumstances disclosed by the evidence warrant no other conclusion than that it was done with the full knowledge and consent of Sanford.

On April 5, 1926, Azel Meadows and wife assigned the Sanford lease, as well as the Van Bibber lease, to Azel Meadows Realty Company, the lease containing no assumption by the assignee of the lessee's covenants. It is to be noted that this assignment does not transfer to the Azel Meadows Realty Company the ownership of the seven and three-fourths-inch strip to the east of Lot 11 upon which one wall of the building stood.

On November 5, 1927, the Azel Meadows Realty Company transferred the two leases to Jackson Building & Loan Association. The transfer contains no assumption of covenants on the part of the assignee, and, of course, transfers no interest in the seven and three-fourths-inch strip.

On September 25, 1928, Jackson Building & Loan Association transferred the two leases to The First City Company. There is no assumption of covenants in this transfer.

The Jackson Building & Loan Association had become the owner of all of the capital stock of The First City Company and that corporation was, to all intents and purposes, its wholly owned subsidiary.

On March 31, 1930, pursuant to the exercise of the option to purchase contained in the Van Bibber lease, The First City Company received a deed from Lucy E. Van Bibber for Lot 10.

On the ninth day of February, 1932, The First City Company bought from the trustee in bankruptcy of Azel Meadows and Azel Meadows Realty Company the seven and three-fourths-inch strip upon which the east wall of the Meadows building stood.

On the eighth day of August, 1934, The First City Company transferred the fee ownership in Lot 10, as well as the ownership in the seven three-fourths-inch strip, to the Huntington Realty Corporation.

On the tenth day of August, 1934, The First City Company transferred to the C. & D. Company all of its rights in the Sanford lease upon Lot 11.

Both the Huntington Realty Corporation and the C. & D. Company were organized as liquidating agencies of Jackson Building & Loan Association and the capital stock of each was issued *pro rata* to the stockholders of the association. The C. & D. Company took from the building association only assets of doubtful value, the assets considered good going to the Huntington Realty Corporation and to other companies organized to receive them.

The position of the plaintiffs is that the covenant to build made by Azel Meadows in the lease from Nathan Sanford was expressly entered into as additional rental and that since the building that Meadows agreed to construct was not to be built at any particular time, performance of the covenant could be exacted at any time and against any tenant who might hold under the lease at the time demand for performance of the covenant was made; that Azel Meadows bought the seven three-fourths inches to the east of Lot 11 for the sole purpose of performing his covenant with Nathan Sanford, and that by so doing and by building the remainder of the wall on the seven three-fourths-inch strip, he complied in part only with his covenant. The plaintiffs contend that this part compliance with his covenant on the part of Azel Meadows had the effect of binding Meadows to cause the seven three-fourths inches to be vested, along with the wall standing thereon, in Nathan Sanford or his successors in title, and that the remaining part of his covenant required him to build a building which would have its west wall extending one hundred feet, inside of and along the western boundary line of Lot 11. The plaintiffs contend that this unperformed part of the covenant can be enforced against The First City Company and Jackson Building & Loan Association in spite of the transfer of the seven and three-fourths-inch strip to Huntington Realty Corporation and of the Sanford lease to C. & D. Company, because the latter corporations have stockholders and directors that are practically identical and the transfers were made to them for the known purpose of taking an unfair advantage of the plaintiffs and for that reason the corporate entities of the two latter corporations will be ignored in a court of equity.

We confess that we cannot follow this reasoning of the plaintiffs in its entirety. In the first place, while it correctly takes the position that the building of the thirty by one hundred foot building was stipulated for as additional rental in the Sanford lease to Azel Meadows, it ignores entirely the fact that the covenant required the

building to be commenced on or before May 1, 1920. We cannot agree that this covenant constituted a stipulation for additional rental to be paid at any time during the term of the lease, thus causing its obligation to fall upon successive tenants until it was fully discharged. While it may rightly be said that time is not necessarily of the essence of this covenant in the strictest sense, we think that it is plain from a reading of the lease that the parties thereto contemplated that the building should be begun on or before May 1, 1920, and completed within a reasonable time thereafter, and that Nathan Sanford and his successors in title should have the right to exact substantial performance of it on that basis. It follows from the position that we have just stated that the covenant to build cannot be regarded as having been partially complied with when Azel Meadows acquired the seven and three-fourths-inch strip and partially built and partially acquired the wall along its entire depth of one hundred and sixty feet, and at the same time partially breached by his failure to construct a two-story wall upon Lot 11 along its western boundary. We think that the covenant to build was either performed or breached, or modified by an additional implied contract brought about by the conduct of the parties, within a reasonable time after May 1, 1920.

On the other hand, defendants contend that when Azel Meadows acquired the seven and three-fourths-inch strip along the eastern boundary of Lot 11 and built a part of the wall thereon so that there was a brick wall along its entire depth of one hundred and sixty feet, he obligated himself in no way to convey the strip of land with the wall on it to Nathan Sanford or his successors in title, and that his conduct did not create an easement in the wall and strip of land in favor of the owners of the Sanford lot. The defendants' position is that the conduct of Azel Meadows in not commencing his building on or before May 1, 1920, and, when he did construct it, departing radically from the terms of his covenant, constituted a breach of that covenant and, since a broken covenant ceases to run with the land, there is neither

privity of contract nor privity of estate respecting the covenant on the part of any later tenant that requires it to perform this obligation. Defendants contend that if there should be found any obligation on the part of tenants after Azel Meadows to perform the covenant, or any part thereof, such an obligation can rest only upon privity of estate and is only enforceable as such against each successive tenant during his tenancy. They say that the circumstances shown by the proof do not amount to fraud, and that there is no warrant for ignoring the separate corporate entities of Huntington Realty Corporation and C. & D. Company even though the assets they received from The First City Company and Jackson Building & Loan Association were assigned to them for the very purpose of relieving the Jackson Building & Loan Association and The First City Company of any obligations under the Sanford lease.

While we freely admit the difficulties that exist in attempting to·apply correct legal principles to this rather unique state of facts, we are of the opinion that the solution lies between the conflicting contentions of the parties litigant. There can be no doubt as to what the undertaking of Azel Meadows was under the covenant of the lease that he took from Nathan Sanford. He undertook, as additional rental, to construct a building of brick, thirty by one hundred feet, with a two-story front. This he did not do. Instead of doing what his covenant required him to do he constructed a building, not entirely upon Lot 11 but covering the entirety of both Lots 10 and 11. No wall of this building actually constructed by Meadows was upon Lot 11, excepting a partition wall approximately twenty feet west of its eastern line. For the eastern wall of the building that he actually constructed, he acquired seven and three-fourths inches of land lying outside of and along the eastern line of Lot 11 upon which there already stood a brick wall for about one hundred twenty feet, and he completed the wall on the seven and three-fourths-inch strip for the remainder of its entire depth of a hundred and sixty feet, so that he provided for his building a one

hundred and sixty-foot wall to the east. He constructed no other building wall on Lot 11 as, of course, his original covenant to build would have required had he literally performed it. The Sanfords*, with either actual or imputed knowledge of what was taking place upon and concerning their property, stood by and acquiesced in this conduct of Meadows. We are of the opinion that the circumstances shown by testimony in which there is little conflict require the inference to be drawn that they impliedly consented and agreed to it, and that the conduct of Azel Meadows, acquiesced in and agreed to by the Sanfords constituted the partial substitution of a new contract for the contract represented by the original covenant in the lease from Sanford to Meadows. A written contract may be modified by the subsequent conduct of the parties thereto relating to the same subject matter. *Azure* v. *Hunter*, 101 W. Va. 191, 132 S. E. 726. But the new contract will be held to depart from the first to the extent only that its terms are inconsistent therewith. *Myers* v. *Carnahan*, 61 W. Va. 414, 57 S. E. 134; *Poteet* v. *Imboden*, 77 W. Va. 570, 88 S. E. 1024.

It follows from the foregoing conclusions that when Azel Meadows acquired and built the wall standing upon the seven and three-fourths-inch strip to the east of Lot 11 in order to carry out his modified understanding with the Sanfords, it was necessary for him to accord to them whatever rights in the wall thereon were necessary to carry out the fundamental purpose of the original covenant, and of the new agreement substituted in lieu of it. It is perfectly plain that the original covenant, requiring the lessee to construct a building upon the property of the lessor the value of which was to constitute additional rental, contemplated that the building should pass back to the lessor or his successors in title with the reversion at the end of the lease. Other-

*Where opinion speaks of "the Sanfords", Nathan Sanford and his successors in title are meant.

wise, of course, the lessor would receive nothing in addition to the money rental stipulated, while the covenant clearly contemplates that the lessee should construct a building as further consideration for the lease. Therefore, we are of opinion that the understanding between the Sanfords on the one hand and Azel Meadows on the other, evidenced by their conduct in modifying the original covenant and undertaking in its place the construction that resulted in the present building, necessarily contemplated that there should vest in the lessors at the termination of the lease whatever rights in the seven and three-fourths-inch strip were necessary to give them the full use of the wall that stood upon it. Azel Meadows, of course, had contracted to construct a building. He had not contracted to acquire additional land that should vest in his lessors in fee. Neither do we find room in the proof to sustain the inference that the implied contract which modified the original covenant contemplated more than that the ownership of the east wall, together with whatever rights in the land upon which it stood that were necessary for the full enjoyment of such ownership, should pass to the lessors in lieu of the reversion in the building which they otherwise would have received, and in lieu of the construction of the west building wall to the depth of one hundred feet. We do not believe that it is necessary to imply from the conduct of the parties, as shown by this record, that it was the purpose of Azel Meadows to transfer the seven and three-fourths-inch strip in fee to the Sanfords. The building that the Sanfords would have received in reversion, had the original covenant been fully complied with by Azel Meadows would, it is true, have reverted to the lessors in absolute ownership. The additional consideration, however, which they would have received from performance of the covenant would have been the enjoyment of the building, or of the walls thereof, for the life of the building. As we have already stated, the implied contract, represented by the conduct of the parties, we think, necessarily contemplated that some rights in the seven and three-fourths-inch strip at the termination of the

lease should be substituted for the rights in reversion that the lessor would have received under the original covenant. The least that could be substituted would be an easement in the seven and three-fourths-inch strip and the ownership of the wall standing thereon. It is at once apparent that a mere easement in the east wall itself for the maintenance of the present building, would not work substantial justice because the lessor (Sanford) and his successors in title can exercise no control over the west wall of the present building which stands upon the Van Bibber lot. It lies within the power of the owners of the Van Bibber lot to end the life of the present building by devoting their lot to some other purpose. We must assume that the implied contract of the parties contemplated an adjustment that would be substantially fair and reasonable to both the contracting parties. The use, therefore, of the east wall on the seven and three-fourths-inch strip, to which the present owners of Lot 11 are entitled, must extend beyond a sustaining of the present structure and must include the present or any future structure in which the present wall standing upon the seven and three-fourths-inch strip can be utilized. We think that there is no need to go beyond this because any building constructed under the original covenant would have given the lessors in reversion no more enjoyment in its walls than that which is co-extensive with the existence of those walls. This, we think, is imposing the least burden upon the seven and three-fourths-inch strip that can fairly and reasonably be implied from the conduct of the parties.

So, we are of opinion that the original covenant contained in the Sanford-Meadows lease was subsequently modified by the conduct of the parties with reference to the subject matter of that covenant. Considering the covenant itself and the modification thereof by the subsequent conduct of the parties as constituting together the contract between them, we believe that contract required Azel Meadows to furnish for the use of the Sanfords in sustaining the present or any future building to be placed by them upon Lot 11, the entire one hundred

sixty-foot wall lying on the seven and three-fourths-inch strip just to the east of Lot 11 and an easement in the seven and three-fourths-inch strip to the extent necessary to protect their enjoyment of their rights in the wall. There can be no doubt but that the Sanfords, under the contract as so modified, had fully performed on their part. For all of the years that it has been in effect, they have accepted a rental of sixty dollars a month and have accepted the conduct of Azel Meadows as having constituted a compliance with the covenant of their lease as modified by the subsequent arrangement.

The next question which arises, of course, is whether under the circumstances the written covenant of the lease, as modified by the subsequent understanding by parol, is enforceable.

This brings us into a field where there is much conflict among the decided cases. It has to do with the distinctions, either real or supposed, that have been drawn between mere naked licenses, licenses said to be coupled with an interest, and easements, and the effect of the statute of frauds upon all of them. A large number of cases have been examined but it would be impossible within the scope of this opinion to discuss and to undertake to discriminate among the conflicting principles that they lay down. In our opinion, many of the cases confuse what is called an irrevocable license with an easement. An exhaustive note upon the revocability of licenses is published with the West Virginia case of *Pifer* v. *Brown*, as it appears in 49 L. R. A. at page 497. Particularly, that part of the note under the heading "Equitable Exceptions" beginning at page 507, is of interest in this case. This note was followed by one on the same general subject appearing in 13 L. R. A. (N. S.) at page 991, and by another in 19 L. R. A. (N. S.) at page 700, and by still another in 25 L. R. A. (N. S.) at page 727. The West Virginia case of *Pifer* v. *Brown*, 43 W. Va. 412, 27 S. E. 399, 49 L. R. A. 497, referred to above, in an opinion written by Judge English, affirmed a finding arrived at on conflicting proof that the right to lay and maintain a drain pipe upon adjoining land was a mere

license, and held that as such it was revocable at the will of the licensor. This case was cited and followed in the later West Virginia case of *Dickinson* v. *Foster*, 81 W. Va. 739, 95 S. E. 196. It is true that in the *Pifer* case the right was conferred by parol, but it is submitted that if, in fact, it was a mere license the manner of its creation was immaterial.

But in *Tufts* v. *Copen*, 37 W. Va. 623, 16 S. E. 793, in which the opinion was also written by Judge English, this court had held that an easement for the right-of-way for a tramroad based upon a parol contract that had been executed by the claimant of the easement entering into possession and expending a considerable sum of money upon the construction of the tramroad, after having fully paid and discharged the consideration for the easement, was enforceable in a court of equity. In the *Pifer* case, Judge English does not refer to the *Tufts* case and, so far as we have been able to discover, at no place in our decisions is the distinction between them commented upon. The rule deducible from these two West Virginia cases is that whereas a mere license is revocable (this would seem to be true whether it was created by parol or by writing), nevertheless a verbal contract for the creation of an easement which has been fully or partly performed by the party thereto who seeks to establish the easement will be enforced by decreeing specific performance of the contract notwithstanding the statute of frauds when to refuse to enforce the contract would be tantamount to a fraud upon the party seeking to establish the easement. Some of the cases which sustain this principle are *Rindge* v. *Baker*, 57 N. Y. 209, 15 Am. Rep. 475 (the decision in this case enforces a parol party wall agreement which was partly performed, and discusses principles analogous to those before the court here. Three majority opinions were filed and there were two dissents, although no dissenting opinions seem to have been published) ; *Hazelton* v. *Putnam*, 3 Pinney, 107, 3 Chandler 117, 54 Am. Dec. 158 (this case discusses parol licenses, both those said to be revocable and those said to be irrevocable and attempts to distinguish them) ;

*Wynn* v. *Garland,* 19 Ark. 23, 68 Am. Dec. 190; *Rhea* v. *Forsyth,* 37 Pa. St. 503, 78 Am. Dec. 441. See also the authorities cited at page 692 of 136 Am. St. Rep. in the note to the case of *Smith* v. *Garbe,* 86 Neb. 91, 124 N. W. 921, 136 Am. St. Rep. 674, 20 Ann. Cas. 1209. In addition to regarding this rule as having been established in West Virginia by the *Tufts* case and as having never since then been overruled, we believe that it conforms to and is entirely consistent with that line of cases holding that executed parol gifts of land where the donee has expended money upon substantial improvements are specifically enforceable in our courts of equity. See *Frame* v. *Frame,* 32 W. Va. 463, 9 S. E. 901, 5 L. R. A. 323.

Our conclusion, therefore, is that the original covenant contained in the Sanford-Meadows lease as modified by the parol contract subsequently entered into, evidenced by the conduct of the parties, is specifically enforceable in a court of equity due to the fact that the parties seeking its enforcement have fully performed the undertakings of the contract on their part, and that it would be tantamount to a fraud upon their rights to hold that under the statute of frauds the contract is not enforceable.

As to the west wall which the bill of complaint prays the defendants may be required to build upon Lot 11, we are of the opinion that the proof is insufficient to entitle the plaintiffs to this relief. We are deciding the case upon the basis of an implied contract which we believe the proof shows may fairly and reasonably be said to arise from the conduct of the parties. This modification, we think, was intended by the parties to completely take the place of the building requirement of the original covenant. We do not believe that we can reasonably say that the parties intended the substitution of the seven and three-fourths-inch strip and the wall standing upon it as a partial performance of the original covenant which left the original covenant broken with respect to the wall one hundred feet deep to be erected along the west line of Lot 11. The covenant to construct a complete build-

ing not being divisible, we believe cannot be regarded as having been partly performed and partly breached. As we have already pointed out, we do not believe that it was either performed or breached. The waiver of the building terms of the original covenant was the consideration that moved from the Sanfords to sustain the new implied agreement. The performance of the new implied agreement on the part of Azel Meadows was the consideration that moved from him to the Sanfords to sustain this waiver. We think that it is fair and reasonable to suppose that the Sanfords were willing to accept one wall one hundred and sixty feet deep and the widening by seven and three-fourths inches of the room upon their lot in lieu of the two walls one hundred feet in length that they would have been entitled to under their original covenant. Certainly it would not be reasonable to suppose that Azel Meadows would enter into a new contract which would require him to furnish a wall on the east one hundred and sixty feet deep and to construct a wall one hundred feet deep on the west, thus requiring him to furnish two hundred and sixty feet of wall when the original covenant called for but two hundred, and in addition, to furnish seven and three-fourths inches of land to broaden the room upon Lot 11, unless this record clearly showed that it was to his advantage to do so. The record contains proof as to what the seven and three-fourths-inch strip and the wall standing thereon cost Azel Meadows. It contains no proof whatever of the cost of that part of the east wall which Azel Meadows constructed upon the seven and three-fourths-inch strip. Therefore, there is no basis for comparison from which it can be deduced either that Azel Meadows did or that he did not save money by purchasing the seven and three-fourths-inch strip.

Since it is apparent that the subsequent purchasers of the seven and three-fourths-inch strip took it with full notice of the burdens imposed upon it, it is subject in their hands to the easement imposed upon it.

In accordance with what has already been said, we are of the opinion to reverse the decree of the Circuit

Court of Cabell County and to remand the case with direction that a decree be entered according to the plaintiffs the ownership of the wall now standing upon the seven and three-fourths-inch strip lying to the east of and parallel with the east line of Lot 11, in Block 120, together with an easement in that strip itself for the maintenance of that wall in connection with its use in the building at present standing in part upon Lot 11 and any future building that may be erected thereon by the plaintiffs and their successors in title, and that the plaintiffs be denied the further relief prayed for.

*Reversed and remanded.*