75 So.2d 670

**T. R. MILLER MILL COMPANY, Inc.**

v.

**Philip T. JOHNS et al.**

**3 Div. 966.**

Court of Appeals of Alabama.

Jan. 19, 1954.

Rehearing Denied Feb. 16, 1954.

McMillan, Caffey & McMillan, Brewton,
Caffey, Gallalee & Caffey, Mobile, for appellant.

Flournoy Lovelace, Brewton, for appellees Johns and others.

J. Eugene Foster, Richard S. Brooks,
Montgomery, for Department of Industrial
Relations.

CARR, Presiding Judge.

This appeal is from a judgment in the court below in favor of three claimants for unemployment compensation. By agreement of counsel these cases were tried jointly and the appeals have been consolidated into one record.

The trial judge rendered an identical judgment in each case, the effect of which was that each of the claimants was disqualified to receive unemployment benefits from March 18, 1952 to June 2, 1952, but was not disqualified to receive such benefits for his weeks of unemployment after June 2, 1952. This was in accord with the decision of the Board of Appeals of the Alabama Department of Industrial Relations.

In the main, there is no material or substantial dispute in the evidence.

The nature of the questions presented for our review requires a rather detailed delineation of the evidence.

Without conforming to the formality of noting quotation marks, we will follow in a general way the statement of the facts as they appear in briefs of counsel.

The three claimants and many others were employees of the T. R. Miller Mill Company. The bargaining agent of the employees was Local No. 432 of the International Woodworkers of America.

On April 1, 1950 the employer and the union entered into a contract affecting employment relationships. The pertinent part of the agreement was:

"The term of this agreement, with the exception of wages, shall be for a period of nineteen (19) months commencing April 1, 1950 until November 1, 1951, and from year to year thereafter unless either party serves notice on the other party in writing sixty (60) days prior to the termination date of the agreement of a notice to terminate, revise, or amend this agreement. In case either party serves written notice on the other as provided above, the parties hereto agree to meet within twenty (20) days from the date of notification for the purpose of negotiations on the subject or subjects that may be the basis of such notification or notifications. This contract may be extended by mutual agreement between the Company and the Union.

"The matter of adjustment of wages, either decreases or increases, and the matter of Union Security, may be opened on November 1, 1950 and on May 1, 1951, by either party giving the other party written notice at least sixty (60) days prior to November 1, 1950, and sixty (60) days prior to May 1, 1951."

The employer was under the Wage Stabilization Law, 50 U.S.C.A.Appendix, § 961 et seq., with respect to paying the maximum wages allowed by the Wage Stabilization Board. From time to time the board had amended its rulings as to wages allowed employees. In the fall of 1951, in accord with this custom, the board ruled that a cost-of-living increase should be made to the T. R. Miller Mill Company's employees in the amount of two cents an hour.

On September 4, 1951 the union committee representing the claimants requested the employer to amend the bargaining agreement. The latter refused to comply with the request.

At a meeting, on October 22, 1951, of the representing parties, the employer agreed to allow the indicated increase. At this time the workers' representatives refused.

Following this meeting and ending May 31, 1952, there were eleven conferences held between the union and employer representatives. These were requested by the former, and at each time checkoff of union dues and a salary increase were demanded by the union and refused by the employer. Some time during these various conferences the mill company proposed to make the hourly wage increase three cents instead of two cents which they had previously offered, but at no time would it agree to the union security phase of the controversy.

At a meeting between the representatives held on March 17, 1952, the employer again offered a three cent hourly raise, but would not offer or agree to any change in the contract regarding union security or union shop. The union agreed to accept the pay raise proposed, provided the mill company would join in with the union in recommending to the Wage Stabilization Board a 15% wage increase. The company representatives countered with the proposal that, if the employees would accept the three cent hourly raise, they would counsel with the union representatives and see if some agreement could be reached, but they refused to join the union in recommending a 15% increase in salaries to the Wage Stabilization Board.

On March 18, 1952, without having given the notice required by the contract or without obtaining a leave of absence, the claimants and many other employees who were union affiliates, left their employment. At this time they gave as a reason for leaving that they were to be engaged in a continuous and prolonged union meeting.

On March 31, 1952 the indicated group went on an active strike and placed picket lines around the mill plant. This condition continued until June 2, 1952.

During the entire time of this cessation of work by the union employees, the mill company continued operating its plant, and gave employment to any former employee who reported for work and whose job had not been already filled by another person.

When the strike was called off, the claimants reported for work, but were advised by the employer that their positions had been previously filled by replacements and there was no available work for them.

Title 26, Sec. 214, as amended, Cum.Supp. Code 1940, p. 215, provides in pertinent parts:

"An individual shall be disqualified for total or partial unemployment:

"A. For any week in which his total or partial unemployment is directly due to a labor dispute still in active progress in the establishment in which he is or was last employed; for the purposes of this section only, the term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment * * *.

"B. If he has left his employment voluntarily without good cause connected with such work."

It is evincingly clear that our approach to this review must be related to the question of whether or not the claimants left their employment because of a labor dispute in active progress. In other words, if their unemployment was not due to a labor dispute, they left voluntarily without good cause, and they should be denied benefits under subsection B of the statute quoted above.

The appellant—intervenor—takes the position that, by the provisions of the contract of employment set out above, the "matter of adjustment of wages, either increases or decreases, and the matter of Union Security" could not be taken up by the parties except at designated times and under specified conditions, and that, under the undisputed evidence in the case, these terms and provisions of the agreement were not observed. For this reason, it is urged, the disagreement between the parties which resulted in the unemployment of claimants was not due to a labor dispute within the purview of the applicable statute.

In the case of Department of Industrial Relations v. Stone, 36 Ala.App. 16, 53 So. 2d 859, 861, this court held in effect that it is not every dispute relating to labor that comes within the meaning and interpretation of the statute. We said: " * * * it must be a 'bona fide', as opposed to 'mala fide', difference in opinion among the disputants."

Appellant discusses, with considerable emphasis and reliance, the holding in this case. It is urged that the dispute in question was not "bona fide" because of the nonobservance of the provisions and conditions of the contract.

Appellees press several positions in an effort to sustain the judgment below. One of these is:

"Parties can, by mutual consent, waive the provisions of a collective bargaining agreement, and this mutual consent can be gathered from the conduct of the parties as well as from any specific agreement."

■ We entertain the view that under the evidence in the case there is merit in this position.

This conclusion is decisive of this appeal, and we see no need to go into a discussion of the other questions.

The general rule of instant concern is found in 17 C.J.S., Contracts, § 375, at pages 860 and 861:

"Modification must be made by the contracting parties or someone duly authorized to modify, and one party to a contract cannot alter its terms without the assent of the other parties; the minds of the parties must meet as to the proposed modification; hence a stranger cannot become a party to a contract without the consent of all the existing parties. The fact of agreement may be implied from a course of conduct in accordance with its existence. So, assent may be implied from acts of one party in accordance with the terms of a change proposed by the other; and assent to new terms of performance, even if invalid as a contract, will serve as an estoppel excusing what otherwise would be a default. However, it is not sufficient to show an ambiguous course of dealing from which one party might reasonably infer that the original contract was still in force, and the other that it had been changed, although a promise to ratify acts done under the contract may amount to an assent to modification."

This doctrine seems to have proceeded from the English rule. In the case of Cuff v. Penn, 1813, 1 Maule & Selwyn (Eng.), 21, the defendant had by a written contract purchased of plaintiff "300 hogs of bacon" to be delivered at fixed and stated times. After a part of the order had been delivered, the plaintiff assented to a change in the time of the deliveries as specified in the contract. In response to the review, Lord Ellenborough, C. J., said:

"It is admitted that there was an agreed substitution of other days than those originally specified for its performance. * * Suppose a delivery of live hogs instead of bacon had been substituted and accepted, might not that have been given in evidence as accord and satisfaction? So here the parties have chosen to take a substituted performance."

In the case of Moore v. Williamson, 213 Ala. 274, 104 So. 645, 648, 42 A.L.R. 981, the Supreme Court approved the following excerpt from L.R.A.1915B, page 70:

"* * * either party may waive any right or benefit he may have by a contract, and if the other party acts upon the faith of the waiver, the question of consideration is out of the case, upon the doctrine of estoppel * * *."

The case of Hertz v. Montgomery Journal Publishing Co., 9 Ala.App. 178, 62 So. 564, 567, has to do with the doctrine of instant concern. The facts are too lengthy to make it practical for us to delineate them. This court announced in effect that parties to a contract may modify or alter the terms of the agreement so long as it is executory with or without doing so in writing, and we said:

"Such assent may be express or it may be implied from the conduct of the parties, and expressly or impliedly involves a waiver of any right either party might have had under the original contract, but for the new agreement. * * * Furthermore, even if a party does not actually assent to a change or modification made by the other party, she may so act as to estop herself from denying that she assented; and will do so if her conduct after the change or modification is such as to be inconsistent with a right to stand on the old contract."

To like effect is the holding in Andrews, Allen & Moorefield v. Tucker, 127 Ala. 602, 29 So. 34.

See also, Stewart v. Cross, 66 Ala. 22; Brigham & Co. v. Carlisle, 78 Ala. 243;

482

Jones v. First Nat. Bank of Greensboro, 206 Ala. 203, 89 So. 437; George v. Roberts, 186 Ala. 521, 65 So. 345; Lowy v. Rosengrant, 196 Ala. 337, 71 So. 439; Spencer v. Richardson, 234 Ala. 323, 175 So. 278.

The following are cases from other jurisdictions which follow the doctrine of instant discussion: Sanford v. First City Co., 118 W.Va. 713, 192 S.E. 337; Smith v. Washburn-Wilson Seed Co., 54 Idaho 659, 34 P.2d 969; Jacob v. Cummings, 213 Mich. 373, 182 N.W. 115; Bate v. First Nat. Bank & Trust Co. of Racine, 225 Wis. 564, 275 N.W. 450; Stewart Law & Collection Co. v. Krambs, 139 Cal. 318, 73 P. 854; Condit & Conser, Inc. v. Moon Motor Car Co., 129 Or. 161, 276 P. 265; Grider v. Three States Lumber Co., 72 Ark. 190, 79 S.W. 763; Fox v. Tyler, 8 Cir., 109 F. 258; Hadfield-Penfield Steel Co. v. Eastern Production Co., 6 Cir., 281 F. 382.

In the Matter of Paducah Battery Co., etc., Vol. 88, Decisions and Orders of the National Labor Relations Board, p. 32, we find the following:

"On August 23, 1948, following a consent election, the Intervenor was certified as the exclusive bargaining representative for the employees in a unit stipulated to be appropriate herein. Thereafter, on January 9, 1949, the Intervenor and the Employer entered into a contract covering the same employees. Among other things, this contract provided that,

"This agreement shall be effective until October 1, 1949, and continue in full force and effect thereafter from year to year unless notice in writing is given by either party sixty days prior to the expiration of this agreement of the desire to amend, change or terminate the agreement. In the case of a request to amend or change the agreement the proposed changes will be submitted in writing at the time notice is given and it is agreed that negotations thereon will begin within ten days of such notice.

"On July 29, 1949, the Intervenor advised the Employer in writing that it desired to amend the contract and stated that the proposed amendments would be forwarded 'in the very near future.' Over a month later the Intervenor sent the Employer the proposed amendments. Subsequently, negotiations were held on these amendments but agreement was not reached on any point. On November 3, 1949, the petition herein was filed.

"On these facts, the Intervenor argues that the contract was automatically renewed on October 1, and therefore is a bar to this proceeding. It is contended by the Intervenor that inasmuch as its notice of amendment did not contain the proposed changes, as provided by the clause in the contract quoted above, such notice was not effective to stay the automatic renewal of the agreement. We do not agree. The parties negotiated on the contemplated changes for more than a month. Whatever defects there may have been in the Intervenor's notice were not considered substantial and must be deemed to have been waived by the parties."

This clearly indicates the minds of the men who have been given the task of interpreting a phase of our labor laws.

See also, Matter of Continental Can Co., 107 N.L.R.B. No. 3; General Motors Corp., 85 N.L.R.B. No. 43.

■ Mr. Downing, executive vice president of the mill company, made this statement in his testimony:

"There were two subjects which invariably the labor union brought up, and only two. One was check-off of union dues and the other was increase in salary. They never specifically asked for any particular increase as my records indicate. They indicated a number of times they were not particularly interested in wages. They wanted a check-off. We invariably called their attention that it was a violation of the contract, it was not subject even to negotiation, but the law inposes on the management the right to negotiate and that imposition we have recognized and have never failed to negotiate on any subject."

When the entire history of the negotiations is taken into account, it cannot be reasonably concluded that the employer refused to accede to the requests of the union repre-

sentatives because they were not in accord with the terms and conditions of the contract. In fact, throughout the rather long period of conferences, when eleven meetings were held, there were offers and counter offers relating to the matter of wages and union security.

The ultimate break in the series of conferences seems to have been occasioned by these circumstances:

On March 17, 1952, the union had a meeting and voted to have one member call Mr. Downing and ask him to meet with all of the company employees in front of the office on the morning of March 18. "It was in the minds of some of the union leaders that there was some doubt in the minds of the management as to whether or not we represented the majority of the workers, and we wanted to have this mass meeting for the purpose of showing the company how many people were interested in the things we were asking for."

On the morning of March 18, 1952, the men met in front of the company office. Mr. Downing, who was the principal negotiator for the company, told them he would talk to a committee but not to a mob, and turned and walked back into the company office.

The men thereupon in a body, roughly 400 of them, went to the union hall and began discussions as to what to do. It was finally decided to appoint a committee to call on the management that afternoon. It met with Mr. Downing, and Mr. Thomsen was spokesman for the employees' committee. Mr. Downing asked what was the purpose of the meeting? Mr. Thomsen replied, asking whether the company had anything further to offer at that time. Mr. Downing replied "not a G—— d—— thing."

We are clear to the view that the evidence sustains the judgment of the court below.

It is ordered that said judgment be affirmed.

Affirmed.