EMPIRE BOX CORPORATION, a Corporation of the State of Delaware, Defendant Below, Plaintiff in Error, v. JEFFERSON ISLAND SALT MINING COMPANY, a Corporation of the State of Delaware, Plaintiff Below, Defendant in Error.

(*January* 20, 1944.)

HARRINGTON, Ch., RODNEY and SPEAKMAN, J. J., sitting.

*Hugh M. Morris* and *Edwin D. Steel, Jr.,* (of Morris, Steel and Nichols) for Empire Box Corporation, Defendant Below, Plaintiff in Error.

*James R. Morford* (of Marvel and Morford) for Jefferson Island Salt Mining Company, Plaintiff Below, Defendant in Error.

Supreme Court, No. 1, June Term, 1942, and No. 1, October Term, 1942.

* * * * *

HARRINGTON, Chancellor, delivering the opinion of the Court:

In the court below, Jefferson Island Salt Mining Company declared on a contract made March 11, 1940, whereby Empire Box Corporation, the defendant in that court, agreed to deliver 4,429,476 hexagon salt cartons, of a certain kind, and conformable to sample, to the plaintiff, at Jefferson Island, Louisiana, as ordered, but before September 1, 1940, at $4.60 per thousand. Jefferson Island alleged the defendant's refusal to deliver the cartons, and the resulting damages. In overruling a demurrer to the plaintiff's declaration in that action, the trial court (2 *Terry* (41 *Del.*) 386, 23 A. 2d 106) pointed out that it alleged that the terms of the contract of March 11, 1940 were the terms and conditions of an earlier contract, made May 27th, 1939, as the same was supplemented, altered or changed by the plaintiff's letter of December 21, 1939, whereby "the plaintiff obligated itself to receive and accept, and the defendant obligated itself to ship and deliver, the balance of 4,429,476 hexagon salt cartons, at the price of $4.60 per thousand cartons, on or before the 1st day of September 1940." The order, on which the earlier contract of May 27th, 1939 was based, appears in the preliminary statement of facts. In the same opinion, the court, also, pointed out that it appeared from the declaration that the original contract provided for the delivery of 5,000,000 hexagon cartons, of a certain kind and quality, and in accordance with sample, to be shipped out by the defendant, a small quantity only to be manufactured on "the first run," to prove conformity, with privilege of cancellation if not in compliance; and that during August, 1939, the defend-

ant delivered 570,524 cartons, which, although not consider-ed satisfactory, were, after negotiations, accepted and ap-proved on September 27th, 1939, and thereupon the plaintiff instructed the defendant to ship forthwith the balance of the order, to-wit: 4,429,476 cartons, at the agreed price of $4.60 for each thousand, but the defendant refused to deliver. The court, also, pointed out that the declaration alleged that the contract of March 11th, 1940 abrogated and superseded the prior contract of May 27th, 1939. Empire Box Corporation pleaded non assumpsit and two special pleas. Under the lat-ter, it contends: (1) that the contract of May 27th, 1939 was merely modified, and not abrogated by the subsequent con-tract of March 11, 1940; and (2) that Jefferson Island Salt Mining Company refused to pay for the shipment of cartons made in August of 1939, except on terms wholly different from those of the May 27th contract, and Empire Box Corpo-ration was, therefore, justified in refusing to ship the bal-ance. Under the plea of non assumpsit, the latter corporation, also, contends that it appears from the record that some of the terms of the original contract were not incorporated, in express terms, in the written order of May 27th, 1939; that there was a variance between the contract declared on and the contract proved. The trial court held that the proof sus-tained the allegations of the plaintiff's declaration, and en-tered judgment accordingly. The defendant's assignments of error question the validity of that judgment on various grounds.

The important question is whether the contract of March 11th, 1940 was a new contract, which included most of the provisions of the original contract of May 27th, but which wholly abrogated and superseded it; or whether the evidence before the trial court required the conclusion that the later contract merely modified the former in some mate-rial respects, including the outside date for the final delivery of the balance of the cartons, originally ordered. In deter-

mining that question, it is necessary to consider the law of accord and satisfaction.

 Since the early days of the common law, it has been held that a mere accord, without satisfaction, is no defense to an action on the original agreement. *Ashland Coal & Coke Co. v. Old Ben Coal Co.,* 7 *W. W. Harr.* (37 *Del.*) 571, 187 A. 596; *In re Trexler Co. of America,* 15 *Del. Ch.* 76, 132 A. 144; 6 *Willist., Contracts, Rev. Ed.,* §§ 1839-1846. Under that rule, everything must be done which the party agreed to do; and so long as it remains executory, the original cause of action is not discharged. 1 *Bouv. Law Dict., Rawle's* 3rd *Rev.,* 105; 7 *Hals. Laws of Eng.,* 2nd *Ed.,* 236. Ordinarily, that rule even applied though suit was brought on the old contract before the expiration of the agreed time, for the performance of the accord, or before the expiration of a reasonable time, if no time were fixed. 6 *Willist., Contr., supra,* §§ 1842, 1843; *B. U. Law Rev.,* June 1941, 465; see, also, 2 *Street, Found. Leg. Liab.,* 93. But the lower court points out that the modern tendency is to apply a more liberal rule. 6 *Willist., Contr., Supra,* § 1841; *Industrial Trust Co. v. Parks,* 57 *R. I.* 363, 190 A. 32, 10 *A. L. R.* 228. By some, it is said that an accord is, in substance, an agreement by one party to an executory contract with the other party to accept in the future a stated performance in satisfaction of a subsisting contractual duty. They say that the gist of the whole transaction is that the creditor is to be compensated for his concession by nothing less than actual performance; that performance, and not a counter-promise to perform, is the inducement for the creditor's promise to forego his original claim. 6 *Willist., Contr., supra,* §§ 1838, 1841, 1842; 2 *Street, Found. Leg. Liab.,* 93; *Restat. Law of Contr.,* §§ 417, 418. The lower court adopted that theory. See, also, *In re Trexler Co., supra.* Other text writers have said that the old rules, applicable to accord and satisfaction, are now wholly anomalous, and are based on historical grounds existing long before the action of assumpsit became a recognized

remedy on an executory contract, based on mutual promises. *B. U. Law Rev., supra,* 467; see, also, 2 *Street, supra,* 89, 93. Whatever the original reason for these rules was, at a comparatively early date, after assumpsit became a recognized remedy in such cases, the logic of the old rule was occasionally questioned in the English Courts (*James v. David,* 5 *T. R.* 141; see, also, *Comyns' Dig. "Accord" B* 4), but without any real success. For a time, the courts may have waivered, but precedent was too strong to be overcome. See *British Russian Gazette v. Asso. Newspapers, Ltd.,* [1933] 2 *K. B.* 616. In modern times, however, the parties to the original contract may agree that a mere subsequent contract to perform some specified act will be accepted in full performance and satisfaction of the pre-existing duty. *Meaker Galv. Co. v. Charles E. McInnes & Co.,* 272 *Pa.* 561, 116 A. 400; *British Russian Gazette v. Asso. Newspapers, Ltd., supra;* 6 *Willist., Contr., supra,* §§ 1841, 1846, 1848; *Industrial Trust Co. v. Parks,* 57 *R. I.* 363, 190 A. 32, 10 *A. L. R.* 234; *Restat. Law of Contr.,* 419. If that is their intent, the old agreement is wholly abrogated and superseded by the new contract, and thereafter the only remedy is on the latter. *Morris v. Baron & Co.,* [1918] *A. C.* 1; *Wheeler v. Woods,* 205 *Iowa* 1240, 219 *N. W.* 407; 6 *Willist., Contr., supra,* §§ 1841, 1846; *Werth v. Willer,* 64 *N. D.* 119, 250 *N. W.* 543, 10 *A. L. R.* 236, 237. That is usually a question of fact, which must be proved by the party alleging it (*In re Trexler Co., supra;* 1 *C. J. S., Accord and Satisfaction,* § 49, pp. 565, 568); and if not expressly or impliedly determined by the provisions of the contract, pertinent evidence of surrounding circumstances is often admissible to prove intent. *Moers v. Moers,* 229 *N. Y.* 294, 128 *N. E.* 202, 14 *A. L. R.* 225; *Meaker Galv. Co. v. Charles E. McInnes & Co., supra;* *Babcock v. Hawkins,* 23 *Vt.* 561; 1 *C. J. S., Accord and Satisfaction,* § 48, p. 560.

The record shows that by the original contract, Empire Box Corporation, the defendant below, the seller, agreed to

deliver to Jefferson Island Salt Mining Company, the plaintiff below, the buyer, at Jefferson Island, Louisiana, 5,000,000 one and one-half pound hexagon salt cartons, of a certain kind, "as ordered out" by the latter company, at $4.60 per thousand. They were to be the duplicate in size, design, printing and color to sample manufactured by Gardner-Richardson Company, and were to be asphalt lined and made of No. 1 white patent coated board. In August of 1939, pursuant to the buyer's order, the seller shipped 570,524 cartons, which, after some controversy, were ultimately conceded to have been manufactured according to sample, and in September of the same year the buyer "ordered out" the balance of 4,429,476 cartons. The seller refused to ship at the agreed price because cardboard prices had sharply advanced, and first insisted on the payment of $4.95 per thousand, and later on the payment of $5.13. Moreover, it refused to guarantee delivery at the latter price. The buyer would not agree to these prices, and insisted that the seller comply with its contract to ship at $4.60 per thousand. In the latter part of October, the buyer notified the seller that it had been compelled to purchase some cartons elsewhere, at a higher price, to supply its needs because of the latter's refusal to live up to its contract. On November 22nd, 1939, the seller offered to furnish "4,000,000 hexagon cartons at $4.95 per thousand * * *." On December 8th, "that offer of compromise" was refused. In other letters, the buyer repeatedly demanded that the seller comply with its contract.

On December 13th, 1939, the seller wrote the buyer that it always lived up to its "contract obligations," and stated that it was willing to "run the balance of the order," but insisted (1) that the buyer first give definite assurances in a certain way that the cartons shipped in August were "entirely satisfactory;" and (2) that the buyer agree "to take out the balance of the order before April 1, 1940." The original contract contained a very different provision. On December 21st, 1939, the buyer wrote the seller, expressing delight that

the latter intended "to live up to the contract we have with you," and enclosed an approved sample of the cartons delivered in August, with a statement that the seller had been notified in September of 1939 that those cartons were satisfactory. In the same letter, the buyer, also, stated: (1) In view of the seller's letter, advising that it was "going through with this contract," it would not be called on to pay the difference between the contract price and the price "we had to pay" for cartons purchased elsewhere; (2) that the buyer would obligate itself "to take out the balance of 4½ million cartons before September 1st, 1940;" and (3) "We are not trying to make this contract difficult. * * * we may have to have new spouts on the balance of this contract."

On January 4th, 1940, the seller wrote the buyer: "* * * our willingness to go along with this contract represents a far greater loss than has ever been taken on any piece of business since this company has been in existence * * *." In the same letter, it stated that the buyer had been responsible for some delays, and added "we don't feel that the entire burden should be borne by us, that is with specific relation to an extension of the time for delivery." On March 11th, 1940, the buyer telegraphed the seller that the former would have to purchase cartons elsewhere unless promptly notified by wire "that you can supply us on contract of May 27th, 1939 as per * * * letter of 12/21/39. Advise in your wire when you can make first delivery at Jefferson Island." Later the same day, the seller telegraphed the buyer "* * * accepting your proposition." On the following day, the seller wrote the buyer, quoting the telegrams of March 11th, and stating "we are willing * * * to proceed with the plan outlined in your letter of December 21, 1939." That letter, also, stated that the seller could make deliveries in three to four weeks "after receiving complete instructions as to what you require." The next day, the buyer sent the seller a sample for design and lettering, and requested that it proceed with the manufacture of the cartons. On March

13th, 1940, the buyer wrote the seller, thanking it for its letter in which it had indicated its willingness "to go through with * * * contract." The buyer failed to pay for the cartons shipped in August of 1939, and on May 14th, 1940, the seller, referring to a prior telephone conversation, relating thereto, wrote the buyer: "You told me * * * frankly that the reason you didn't send us your check was because you weren't sure that we would fill the balance of your order." The seller refused to ship any of the cartons until payment had been made for the August 1939 deliveries, and on the next day the buyer, in a letter insisting on the shipments being made, used the phrase: "When you agreed to go ahead with this contract, the board market was low" * * *. None of this evidence is disputed, and the seller claims that it conclusively shows that the contract of March 11th, 1940 was merely intended to modify the earlier agreement of May 27th, 1939, and not to abrogate and supersede it. The trial court held otherwise, and we find no error in that conclusion.

It appears from these facts that in September of 1939, Empire Box Corporation refused to comply with its contract of May 27th, 1939, because cardboard prices had advanced, and demanded more than $4.60 per thousand. Jefferson Island refused to comply with these demands, and insisted on performance of the contract, and clearly indicated an intent to hold the seller responsible for any damages suffered for its failure to perform. The controversy went on for months, and several offers of compromise were made by Empire Box Corporation, but were not accepted. In the meantime, Jefferson Island was compelled to purchase a considerable supply of cartons elsewhere, at higher prices, to supply its immediate needs. In December of 1939, Jefferson Island made Empire Box an offer which was ultimately accepted by the latter on March 11th, 1940. The trial court held that the result of that contract was that the balance of the 5,000,000 cartons, covered by the agreement of May 27th, 1939, was to be ordered out by the buyer not later than Sep-

tember 1st, 1940, and that all damages, theretofore suffered by the latter, because of the seller's refusal to comply with its contract obligations, were expressly forgiven, and that controversy was settled. The letters and telegrams, on which the contract of March 11th, 1940 was based, do not expressly provide that it was intended to abrogate and supersede the earlier repudiated contract of May 27th, but the provisions for the waiver of damages introduced an entirely new element which is scarcely consistent with the theory that the original contract was merely modified. See *Babcock v. Hawkins, supra;* 1 *C. J. S., Accord and Satisfaction,* § 48, p. 560. A close question of fact was involved but it cannot be said that there were no facts and circumstances on which the judgment of the trial court sitting without a jury could be based. See *Wheeler v. Woods,* 205 *Iowa* 1240, 219 *N. W.* 407.

Nor was there any error in the conclusion of the trial court that all of the terms of the original contract of May 27th, 1939 were incorporated in the written order of that date and that the subsequent contract of March 11th, 1940, as proved, sustained the allegations of the declaration filed. That was likewise a question of fact, and it seems unnecessary to set out the evidence on which the conclusion of the court was based.

The written order was sent pursuant to the defendant's request that a formal order be placed, and stated that it confirmed a prior verbal order of April, 1939; but it can hardly be contended that it, necessarily, follows that some of the terms of the final contract are to be found elsewhere. There were several propositions and counter-propositions by letter, with respect to the precise terms to be agreed on, but it does not conclusively appear that other provisions, insisted on by the defendant in prior negotiations were intended to be included, by reference, in the order that was finally placed. The facts justify a contrary inference. Among other things, several letters, written by Empire Box Corporation to the plaintiff below subsequent to May 27th, 1939, expressly re-

ferred to the latter's order "No. 216," by which the written order of that date was designated on its face.

■■ Empire Box Corporation did not manufacture and deliver any of the cartons called for by the contract of March 11th, 1940. In view of the fact that that contract superseded the original one, the alleged reason for the failure to deliver need not be considered. In any event, the seller claims that, under the proof, the judgment entered for Jefferson Island Company is excessive. That was largely a question of fact, for the determination of the trial court. *Abrams v. C. Schmidt & Sons,* 143 *Pa. Super.* 339, 17 A. 2d 681. That court conceded the plaintiff's right to make a contract to purchase elsewhere when the defendant refused to deliver, but held: (1) That the 1940 contract called for the manufacture and delivery of hexagonal salt cartons, made from a special moisture-proof cardboard; (2) that, by reason of location, freight rates and otherwise, there were so few available manufacturers of that type of carton that there was "no market or current price" therefor, at the time and place of delivery (*Abrams v. C. Schmidt & Sons, supra;* 24 *R. C. L.* 72, 73; 55 *C. J.* 1175); (3) that the buyer was bound to purchase the required number and type of cartons "at the lowest possible price at which it could obtain them" (*Monad Eng. Co. v. Stewart et al.,* 2 *Boyce* 35, 78 A. 598; *Stewart v. Monad Eng. Co.,* 3 *Boyce* 165, 84 A. 209; 55 *C. J.* 1172); and (4) that, under the circumstances, "plaintiff acted in good faith and was justified in purchasing its requirements from Gardner-Richardson Company at the price charged by that Company," $5.45 per thousand. *Abrams v. C. Schmidt & Co., supra.* The record justifies these conclusions, with respect to the facts; and the applicable legal principles are not disputed.

■■ A market cannot be considered available unless the buyer can satisfy his needs therein. *Abrams v. C. Schmidt, supra.* The original contract of May 27th, provid-

ed that the cartons should be made from ".025 asphalt lined #1 white patent coated board." The cardboard manufactured by Gardner-Richardson Company was laminated or impregnated with asphalt, and the fair inference is that the court found that its cartons complied with this provision. The board made by Empire Box Corporation was of laminated chipboard, merely pasted together with asphalt as an adhesive. The contract, also, provided "if the cartons are not equally as satisfactory as those we are now using from Gardner-Richardson the order will be cancelled." Jefferson Island Company first claimed that seller's cartons were not satisfactory, but subsequently approved those shipped in August of 1939. During the negotiations, prior to the March 11th contract, Empire Box insisted that Jefferson Island give definite assurances, in a specified manner, that those cartons "were entirely satisfactory." In the buyer's letter of December 21st, 1939, it enclosed an approved sample, with a statement that it had notified the seller in September of 1939 that they were satisfactory. This letter was the offer on which the subsequent contract was based, but it does not, necessarily, follow that the provisions of the original contract of May 27th, 1939 were modified thereby, with respect to the type of cartons to be delivered. That was likewise a question of fact for the trial court to determine.

Empire Box Corporation sued Jefferson Island Salt Mining Company in the court below for its failure to pay for the cartons delivered in August of 1939, and the latter filed a notice of recoupment in that action. The present action of Jefferson Island Salt Mining Company against Empire Box Corporation was brought in the same court, and both actions were finally set for trial at the same term. Because the evidence in each case would, necessarily, be somewhat the same, the trial judge directed that they be tried at the same time. Jefferson Island Company was then permitted to withdraw its notice of recoupment in the action in which it was the defendant. These rulings were objected

to by the attorney for Empire Box Corporation. He then agreed, however, that both cases should be tried by the court without a jury, but reserved the right to except to the other procedure adopted. Over his objections, the trial court then directed that the action, in which Jefferson Island Salt Mining Company was the plaintiff, be tried first. At the trial, each case retained its separate character, and separate judgments were entered. We find no abuse of discretion in the procedure adopted. *Giguere v. Yellow Cab Co.*, 59 *R. I.* 248, 195 A. 214, 215; 64 *C. J.* 35. The order of the hearings was a matter within the court's discretion. Nor did the trial court err when it held that the allegations of the plaintiff's declaration were not fatally repugnant on demurrer. 2 *Terry* (41 *Del.*) 386, 23 A. 2d 106; see, also, 3 *Terry* (42 *Del.*) 258, 31 A. 2d 240.

Other questions raised need not be considered.

The judgment below is affirmed.

Empire Box Corporation filed a motion for a rehearing on the ground that the contract of March 11th, 1940, merely modified the prior contract of May 27th, 1939, and did not supersede it; on February 28th, 1944, the court denied the motion.