**PEPSI–COLA BOTTLING COMPANY OF ASBURY PARK, a corporation of the State of New Jersey, and Pepsi-Cola Newburgh Bottling Co., Inc., a corporation of the State of New York, Plaintiffs,**

v.

**PEPSICO, INC., a corporation of the State of Delaware, formerly known as Pepsi-Cola Company, Defendant.**

Court of Chancery of Delaware,
New Castle.

Sept. 21, 1971.

See also Del., 261 A.2d 520.

E. Norman Veasey and R. Franklin Balotti of Richards, Layton & Finger, Wilmington, for plaintiffs.

William S. Potter and Charles S. Crompton, Jr., of Potter, Anderson & Corroon, Wilmington, and Benjamin Algase, New York City, for defendant.

MARVEL, Vice Chancellor:

Plaintiffs in this consolidated action are independent bottlers who in the 1940's had been exclusively and formally appointed by defendant to prepare for sale over an indefinite period within specified boundaries a product known as Pepsi-Cola, a beverage derived from adding sugar syrup and carbonated water to a secret ingredient or concentrate marketed by defendant. Both appointments here in issue called for their termination or cancellation by defendant on the happening of certain events postulated in each such appointment. Thus, a prime condition of each appointment (paragraphs 3 and 4) was that plaintiffs not bottle any beverage which could be confused with Pepsi-Cola, while paragraph 6 of each appointment was in the form of a covenant that plaintiffs " * * * will in no way change or alter Pepsi-Cola * * * ". Paragraphs 1 and 2 of each appointment, on the other hand, required plaintiffs to conform to defendant's instructions " * * * in relation to the said bottling * * * "[1] as well as to operate clean bottling plants in compliance with applicable sanitary regulations. Other paragraphs of plaintiffs' formal appointments required that they sell Pepsi-Cola in cases of 24 bottles, each bottle to contain 12 fluid ounces of such beverage, and forbade the transfer of such appointments without defendant's written approval.

The prayers of both complaints asked for a decree requiring the bottling appointments sued on to be specifically performed and also sought an order requiring defendant to supply plaintiffs with the former's concentrate at what plaintiffs claimed was " * * * the legal contract price * * * " for such ingredient and its stipulated accessories. Finally, injunctive relief was sought against any future price increase for defendant's concentrate not specifically authorized by the terms of the appointments as well as an accounting for alleged overpayments made by plaintiffs since defendant's price raises of 1963 and thereafter.

Since their appointments in the 1940's plaintiffs have sold and continue to sell defendant's product under the tradename Pepsi-Cola within the respective exclusive geographical boundaries allocated to each of said plaintiffs by their formal appointments. They claim that their appointment rights were first actionably violated by defendant in 1963 when the latter increased the price required to be paid by plaintiffs for defendant's product to a sum in excess of the price stipulated in plaintiffs' appointments without allegedly correlating said increase with the cost factors enumerated in paragraph 10 of each of said plaintiffs' appointments. Later, after the present suits had been filed, plaintiffs amended their complaints so as to seek relief against an additional price increase for Pepsi-Cola concentrate and syrups imposed by defendant's notice of March 5, 1968, which price

[1]. The paternalistic nature of appointments such as the ones in issue is well illustrated by the case of Ard Dr. Pepper Bottling Co. v. Dr. Pepper (CA 5), 202 F.2d 372. The Supreme Court of Delaware recently passed on the constitutionality of a statute the purpose of which was to buttress the rights of private franchise holders, Globe Liquor Co. v. Four Roses Distillers (Del. Supr.Ct.1971), 181 A.2d 19.

was further increased by defendant without plaintiffs' approval in 1970 and again in 1971.

A number of other Pepsi-Cola bottlers, who are not parties to this suit, are authorized to market defendant's concentrate under appointments similar in form to those under which plaintiffs carry on their business. However, the great majority[2] of bottlers licensed by defendant to prepare and market Pepsi-Cola do so under appointments whose terms do not purport to limit price increases for defendant's product to factors such as those enumerated in plaintiffs' appointments but rather provide that defendant's bottlers are to pay such price for its merchandise as defendant shall determine is appropriate in the light of market conditions, defendant's general overhead, as well as the specific costs of its national advertising. Plaintiffs' separate causes of action having been consolidated for trial, this is the opinion of the Court after final hearing.

Plaintiffs seek the entry of declaratory judgments establishing rights claimed by them in their respective appointments and granting them an accounting based on a finding that price increases imposed by defendant on the overall cost for defendant's secret merchandise since July 21, 1963 and thereafter are violative of the express terms of plaintiffs' original appointments, as formally amended in writing. In other words, plaintiffs contend that defendant has purported to increase the price of its secret merchandise and accessories on the basis of factors which have not been formally or tacitly agreed to by plaintiffs, the latter contending, of course, that in order to stay in business they have had no alternative to compliance with such price increases. Plaintiffs, as noted above, also seek injunctive relief against further attempted price increases by defendant de-

hors the formal terms of said original franchise appointments, as formally amended, and an order directing the repayment to plaintiffs of all excessive price increases levied by defendant.

The beverage known as Pepsi-Cola has been marketed for some 60 years although until 1931 sales of such product were confined to the southeastern part of the United States. After enjoying some local popularity for its product in the early 1900's, Pepsi-Cola, for reasons not clear on the present record, was not thereafter profitably marketed, and defendant fell a victim to the 1929 crash and ensuing depression. As a result, on May 26, 1931, under the name National Pepsi-Cola Company, defendant was adjudicated bankrupt for the second time and the Pepsi-Cola formula and trademark were thereafter sold in such proceeding for the sum of $12,000.

The history of the fight for control of the defendant company and its ensuing growth are not relevant to the matters now to be decided except to the extent that the respective financial stakes of defendant and its bottlers in the marketing of Pepsi-Cola have been vastly increased as a result of such growth. In any event, when defendant, on October 5, 1945, granted the plaintiff Newburgh an exclusive bottling appointment for a designated area in the state of New York, Pepsi-Cola had become a nationally known and widely consumed beverage which was sold in bottles of greater fluid content than those used by Coca Cola, the giant in the field, and was thus able to compete with such better known product which was then being marketed at the same price, namely 5¢ a bottle. Early conservative marketing policies have in the intervening years been altered by the introduction of extensive promotional activities on defendant's part, including nation-wide advertising, all of which have in-

---

2. In 1963, some 125 out of approximately 500 Pepsi-Cola bottlers operated under appointments containing one of four types of price limitation clause similar to the ones here in issue. The remaining bottlers have operated under appointments which permit defendant to charge the then price which is " * * * based on the economic factors controlling the operation of defendant's business."

evitably led to a much greater consumption of Pepsi-Cola by the public.

Paragraph 10 of the October 5, 1945 Newburgh appointment reads as follows:

"That Pepsi-Cola will furnish and sell to the Bottler a unit of sufficient of said secret merchandise, together with sufficient crowns and labels, to make and bottle, with the addition of said plain syrup and carbonated water furnished by the Bottler, Twelve Hundred (1,200) cases of Pepsi-Cola, as aforesaid, for the sum of Three Hundred Fifteen Dollars ($315.00) on a C.O.D. basis, freight to be paid by the Bottler, or freight prepaid, provided the Bottler accompanies his check in advance with order. Said price is based upon costs of materials, ingredients, crowns. and labels at the time said price was established, and if higher costs for such materials, ingredients, crowns or labels shall prevail, then said price may be advanced to the extent of such bona fide cost advances."

The same paragraph of the Asbury Park appointment, dated June 28, 1948, for the counties of Monmouth and Ocean in the state of New Jersey, reads as follows:

"That Pepsi-Cola will furnish and sell to the Bottler a unit of sufficient of said secret merchandise, together with sufficient crowns and labels, to make and bottle, with the addition of said plain syrup and carbonated water furnished by the Bottler, Twelve Hundred (1,200) cases of Pepsi-Cola, as aforesaid, for the basic price of Three Hundred Fifteen Dollars ($315.00), freight prepaid, payment to be made by the Bottler in advance of shipment, provided that if labels are not furnished with any such unit due to use of ACL bottles, the basic price shall be Three Hundred Five Dollars ($305.00). Said basic price is based upon costs of materials, labor and freight at the time said price was established, and if higher costs for such mate-

rials, labor and freight shall prevail, then said price may be advanced to the extent of such cost advances."

It should be noted at the outset that the provisions of the second sentences of these two paragraphs differ slightly. The Newburgh appointment provided that the price of defendant's product was to be " * * * based upon costs of materials, ingredients, crowns and labels at the time said price was established * * * ". The equivalent clause in the Asbury Park appointment, on the other hand, provided that such price is to be " * * * based upon costs of materials, labor and freight at the time said price was established * * * ". In the case of both paragraphs, however, notwithstanding the different elements of cost referred to in the two paragraphs, the appointment price in each instance was fixed at $315 for sufficient concentrate " * * * together with sufficient crowns and labels * * * " to make 1,200 cases of Pepsi-Cola. Thus, the price per case fixed in each appointment was the same for each plaintiff, namely $.2250 per case, despite disparity in the stipulated factors on which such price was arrived at and future increases separately premised.

Inasmuch as both plaintiffs are located near defendant's Long Island City plant they have for many years (from 1949 in the case of Asbury Park and 1954 in the case of Newburgh) purchased defendant's mixed product in the form of finished syrup which is delivered in specially designed tank trucks from defendant's nearby plant. Concentrate, on the other hand, which, I am satisfied, is a synonym for secret merchandise [3] is shipped in drums to more distant bottlers and requires the manufacturing process outlined in paragraph 10 of the original appointments in order to arrive at the finished product. Finished syrup, on the other hand, is in effect the end product, being the equivalent of fountain syrup. It calls for its storage until bottling rather than for the mixing process

---

3. See paragraph 4 of complaints.

called for on sales of concentrate. Prices for finished syrup were thereafter set in special notices, which, while taking into consideration the appropriate price for concentrate, at the same time fixed overall prices without reference to the formula contained in paragraph 10 of the appointments here in issue. Furthermore, in addition to accepting changes such as those requiring plaintiffs to procure their own caps and labels (or else pay a premium for the latter) plaintiffs over the years, without committing themselves to a formal appointment, have become de facto distributors of other products of defendant such as Mountain Dew and Patio Diet Cola.

Each appointment now in issue concludes with an identical paragraph 16 which provides:

"That this written Appointment of said Bottler expresses fully, the understanding, and that all prior understandings are hereby cancelled and no future changes in the terms of this Appointment shall be valid, except when and if reduced to writing and signed by both Bottler and Pepsi-Cola, by legally authorized officials."

Plaintiffs' basic premise, as pleaded, is that despite the fact that price change notices sent to both plaintiffs over the years until 1963 both lowered and raised,[4] the price of concentrate and other supplied items, none of such price changes relates to the price change provisions of the contracts in issue and therefore have nothing to do with plaintiffs' contractual rights. They further point out that in conformity with the clause above quoted Newburgh

on December 3, 1959, was formally authorized in writing to sell Pepsi-Cola by means of pre-mix equipment in addition to previously authorized sales of such product in 8, 12, and 26 ounce bottles.[5] The amendment concludes:

"Except as expressly modified hereby, all terms of your Pepsi-Cola Exclusive Bottling Appointment remain in full force and effect."

On October 31, 1961, a similar formal agreement was entered into between defendant and Asbury Park under the terms of which the latter was authorized to bottle and sell Pepsi-Cola in cases of bottles of 26 fluid ounces in addition to the previously authorized 8 and 12 ounce bottles. Again the amendment concluded:

"Except as expressly modified hereby, all terms of your Exclusive Appointment shall remain in full force and effect."

Defendant's answer to this basic contention of plaintiffs is that the October 31, 1946 price increase having raised the price of 1200 cases of Pepsi-Cola from $315 to $350,[6] the permissible ceiling on such product in 1963 under plaintiffs' own theory, was the latter rather than the former figure and that accordingly defendant's 1963 price increase to $.2275 per case for the materials required from defendant for readying Pepsi-Cola for bottling was in fact below the 1946 increase level which called for a cost of $.2542 per case. By the same method of cost calculation, according to defendant, the 1968 cost increase to $.2550 per case fails to fall within the October 31, 1946 price increase level by a

4. Curiously enough, when Asbury Park was appointed on June 28, 1948, the price for ingredients for 1,200 cases of Pepsi-Cola had already in 1946 reached a ceiling of $350 for the same number of units as a result of an October 31, 1946 price increase notice which gave as a reason for such increase " * * * the substantial rise in price of materials and other costs * * * ". Such notice also released all bottlers from the 80¢ provision of Clause 9 of defendant's appointments, which re-

lease appears relevant to Newburgh's appointment but not to Asbury Park's.

5. The original appointments of both plaintiffs, however, required the furnishing of only 12 ounce bottles " * * * to be approved by Pepsi-Cola * * * ".

6. The Asbury appointment was, of course, not granted until 1948 at which time the 1946 ceiling of $350 was at odds with the $315 figure set forth in paragraph 10 of the appointment.

mere $.0008 per case and could possibly be based on the factors listed in paragraph 10.

Plaintiffs insist, however, notwithstanding their original position, that inasmuch as defendant's files have failed to disclose a formal document of any description relating to price changes for defendant's secret merchandise and other materials computed within the confines of paragraph 10, that such price changes as have taken place up to 1963 must necessarily have been based on the language contained in paragraph 10 of the two appointments here in issue, subject to a ceiling price of $315 per 1200 cases, as provided for in such appointments. Accordingly, when the July 26, 1963 price increase announcement was received by plaintiffs, an explanation was demanded as to how an $80 per unit price increase (later reduced to $40) had been arrived at " * * * within the limitations which Paragraph 10 prescribes * * * ".

Plaintiffs, in support of the proposition that their rights are firmly established in their appointments, as amended in writing, rely on the case of Gloeckner v. School District, 405 Pa. 197, 175 A.2d 73, which holds that unconvincing oral testimony cannot overcome a solemn commitment in writing and thus serve to waive a written requirement that a would-be purchaser of certain mining rights complete the removal of coal from a leased area within five years, the court stating:

"An oral contract (allegedly changing the terms of a written contract) must be of such specificity and directness as to leave no doubt of the intention of the parties to change what they had previously solemnized by a formal document."

The Pennsylvania court, in reaching such reasonable conclusion, did not comment on situations where oral testimony of waiver is convincing and made no reference to a long line of Pennsylvania cases in which oral modifications of written contracts had been found to be established by the evidence. Thus, in Elliott-Lewis Corp. v. York-Shipley, Inc., 372 Pa. 346, 94 A.2d 47, the Court stated:

"However, it is well settled that a written agreement may be modified by a subsequent (written or) oral agreement and that this modification may be shown by writings or by words or by conduct or by all three. Betterman v. American Stores, 367 Pa. 193, 80 A.2d 66; Knight v. Gulf Refining Company, 311 Pa. 357, 166 A. 880; Friday v. Regent Improvement Co., 330 Pa. 481, 199 A. 914".

See also Weldon & Kelly Co. v. Pavia Co., 354 Pa. 75, 46 A.2d 466, and Brentwood Realty Company v. Moses, 73 Pa.Super. 307.

This established principle is succinctly stated in the leading case of Bartlett v. Stanchfield, 148 Mass. 394, 19 N.E. 549, in which the parties had agreed in writing in a building contract that no changes were to be made therein for the builder's extra work " * * * unless the same is ordered in writing, and the price thereof agreed upon * * * ".

In sustaining the findings of the jury that notwithstanding the parties' written reciprocal undertakings to the contrary there was sufficient evidence to hold the defendant liable on his oral undertakings to pay the builder for additional work and material not called for in the original written contract, the Supreme Judicial Court of Massachusetts in an opinion by Holmes, J. held:

"Attempts of parties to tie up by contract their freedom of dealing with each other are futile. The contract is a fact to be taken into account in interpreting the subsequent conduct of the plaintiff and defendant, no doubt. But it cannot be assumed, as matter of law, that the contract governed all that was done until it was renounced in so many words, because the parties had a right to renounce it in any way, and by any mode of expression, they saw fit. They could substitute a new oral contract by conduct and intimation, as well as by express words."

This case was cited in the case of Pan American World Airways v. United Aircraft Corp., 53 Del. 7, 163 A.2d 582, although it was there found inapplicable inasmuch as the Court could not find any evidence of intent to override the express provisions of a formal written agreement. In the recent case of Charles Burton Builders, Inc. v. L & S Construction Co., 260 Md. 66, 271 A.2d 534, however, the court quoted from Freeman v. Stanbern Const. Co., 205 Md. 71, 106 A.2d 50 as follows:

> "We hold that a subsequent oral modification of a written contract may be established by the preponderance of the evidence. Achenbach v. Stoddard, 253 Pa. 338, 98 A. 604; United Steel Co. v. Casey, 6 Cir., 262 F. 889, 891. Of course, if the written contract provides that it shall not be varied except by an agreement in writing, it must appear that the parties understood that this clause was waived. However, such a clause may be waived by implication as well as by express agreement. This rule was adopted in Bartlett v. Stanchfield, 148 Mass. 394, 19 N.E. 549, 550, 2 L.R.A. 625 * * *".

Compare Empire Box Corp. v. Jefferson Island Salt Mining Co., 42 Del. 432, 36 A. 2d 40.

Plaintiffs concede that in so far as they paid without protest the invoiced price for concentrate shipped to them by defendant from the time of their appointments and later paid the price charged for finished syrup, which prices were frequently changed, they acquiesced in billings at odds with the terms of their formal appointments. However, they deny that by so doing they thereby acceded to an amendment of any sort to their contractual rights as defined in paragraph 10. In short, notwithstanding the efforts of defendant's trial counsel to remove paragraph 10 from plaintiffs' cases on the ground that it had been discarded by the parties virtually ab initio, plaintiffs continue to rely on the terms of such paragraph as the measure of their claimed right to an accounting. Thus, plaintiffs insist that by merely paying defendant's bills from the dates of their respective appointments for amounts at odds with the terms of paragraphs 10 they did not waive their formal contractual rights, particularly in regard to those price changes which resulted in their being charged less than what they claim was the fixed contract price, a situation which allegedly continued until the price change of 1963 (compare Components, Inc. v. Western Electric Co., [Del.Supr.Ct.] 267 A.2d 579), five of the nine price changes in question having made either no change in price or called for a price decrease.

Turning to the various price change notices addressed to all Pepsi-Cola bottlers, copies of which plaintiffs concede they received from and after the dates of their respective appointments, and which they complied with, it appears that the first notice of a unit price in excess of $315 was sent out on November 4, 1946, which was, of course, prior to Asbury's appointment. On such date the price of concentrate was raised for a period of nine months to $350 per unit. The notice calling for such price increase referred to " * * * rapidly increasing costs including the sizeable increase in sugar * * *" and attributed the rise to " * * * the substantial rise in the price of materials and other costs * * *". I consider it significant that the phrase "other costs" was not spelled out or related to in paragraph 10. Thereafter, decreases in price took place as sugar became abundantly available while at the same time extensive promotional efforts were pushed by defendant until April, 1953, or after Asbury Park had been granted its appointment, when, according to defendant's notice, due to " * * * increased manufacturing and shipping costs of our concentrate * * *", which " * * * could not continue indefinitely to be wholly absorbed by the Parent Company", it was necessary once more to raise the price of such ingredient, this time from

$315 to $342 per unit. Plaintiffs, of course, take the position that such raise was made within the confines of the language of the formal appointments, although it must be noted that the language of the notice is not directly related to the language of either paragraph 10 here in issue, particularly that of the Newburgh appointment which makes no reference to freight or shipping costs.

The next price change was made by notice of November 21, 1956, such notice having raised the price of concentrate by $30 per unit, stated that:

"Despite rising costs which affect Pepsi Cola Company just as they affect all other businesses today, the Pepsi-Cola Company during 1957 will greatly increase its dollar investment in advertising, sales promotion, and other marketing devices to push the product and the trade-mark toward your customers with greater vigor, frequency and effectiveness than ever before in our history. Through television, radio, printed media and other devices we will implant even more firmly upon the minds of your customers the look and sound of the trademark, the taste and feel of the product."

If it had not been made entirely clear to plaintiffs prior to this notice that defendant had for many years been quoting prices on a theory foreign to the paragraph 10 formula, this 1956 price announcement, in my opinion, clearly put plaintiffs on notice that they were no longer doing business with defendant on the basis of such formulas, the appointments being silent as to promotional expenditures on defendant's part.[7] Finally, the 1959 formal supplemental contract which granted Newburgh the right to use special pre-mix equipment and a similar formal supplement permitting Asbury Park to use 26 fluid ounce bottles have nothing to do with price fixing.

Having maintained silence until 1963 as to overall price changes and conformed to defendant's notices rather than standing firm on their appointments, I am persuaded that plaintiffs effectively waived whatever rights they once had under such original appointments and that the case of Components, Inc. v. Western Electric, supra, in which the plaintiff failed to sustain its contention that it could refuse to accept a lowering in price by the supplying defendant does not aid plaintiffs. In other words, the present plaintiffs by intimated acceptance over the years have, in my opinion, in effect agreed to defendant's price changes, and by such sustained conduct have effectively waived their original formal contract rights. In short, by assenting to both decreases and increases in the price of defendant's product through the voluntary payment over the years of bills based on factors at odds with those enumerated in paragraph 10 of their respective appointments, they have forfeited the right to the equitable relief which they now seek. See Glenn v. Tide Water Associated Oil Co., 34 Del.Ch. 198, 101 A.2d 339; Alsens American Portland Cement Works v. Degnon Contracting Company, 222 N.Y. 34, 118 N.E. 210; Pacific Portland Cement Co. v. Food Machinery, Chemical Corporation (CA 9), 178 F.2d 541, and Payne v. King's Van and Storage, Inc. (Okl.Sup.Ct.) 367 P.2d 173. Compare Reeve v. Hawke, 37 Del.Ch. 25, 136 A.2d 196.

In light of this finding, namely that plaintiffs had effectively waived rights granted in paragraph 10 of their appointment by informally acquiescing to modifications therein not later than early 1957, which finding is based solely on defendant's price change announcements, the reasons given therefor in the several notices and plaintiffs' failure to protest such changes, it will be unnecessary to consider

---

7. On the other hand paragraph 8 of both appointments provides:
"That the Bottler will push vigorously the sale of Pepsi-Cola in said territory through his own salesman and trucks and through jobbers and distributors of Pepsi-Cola in his territory."

defendant's other defenses or plaintiffs' theory of economic duress as well as their objections to evidence proferred by defendant in support of its overall theory of uniform pricing as well as of the price philosophy of the soft drink business in general.

On notice, an order may be submitted granting final judgment to defendant.