Gloeckner, Appellant, *v.* Baldwin Township School District.

Argued October 4, 1961. Before Bell, C. J., Musmanno, Jones, Cohen, Eagen and Alpern, JJ.

*Guy L. Warman*, with him *John A. Metz, Jr.*, and *Metz, Cook, Hanna & Kelly*, for appellant.

*Edward R. Lawrence*, with him *Paul, Lawrence and Rock*, for appellee.

Opinion by Mr. Justice Musmanno, November 14, 1961:

On December 30, 1943, Paul Ciaffoni, a tenant in common with Pete Ciaffoni of a certain 170-acre tract of land in Baldwin Township, leased in writing the "President or River Vein of coal" in the property to Salvatore Falingallo, the lease providing that the lessee was to initially pay $500 and then 15 cents per ton for each ton of coal taken out, by strip or shaft mining, the royalties to apply to the $500. The lessee was to start operations within 60 days from the date of the agreement and complete the project within five years.

On March 4, 1947, Falingallo sold his rights under the lease to John F. Gloeckner, the appellant in this case, for $500. Gloeckner applied to the Baldwin Township authorities for a permit to extract the coal by strip mining process, but the permit was refused be-

cause a township ordinance prohibited strip mining. Gloeckner then attempted in the Court of Common Pleas of Allegheny County to enjoin the township from interfering with his contemplated strip mining. The injunction was denied.

Gloeckner now turned to Ciaffoni to obtain a refund of the $500 consideration he had paid. Ciaffoni refused to return the money but informed Gloeckner that he would not hold him to the 60-day starting time or the five-year-term. Gloeckner did nothing further in the matter. On October 19, 1954, the Ciaffonis leased the same vein of coal to the Lapaglia Contractors, Inc.

On August 13, 1958, the School District of Baldwin Township condemned 8.35 acres of the 170-acre tract. This condemnation which, of course would entail the awarding of damages, spurred Gloeckner into asserting assumed rights under his assignment. He presented a claim to the board of viewers convened to assess damages, but the board awarded him nothing. He filed exceptions to the findings of the board and appealed to the court of common pleas, which affirmed the action of the board.

An appeal to this Court followed.*

The court below held that although the lease did constitute, as Gloeckner maintained, a sale of coal in place, it did not amount to an absolute estate in the coal since it was subject to the condition that the lessee would remove the coal within five years. Admittedly that was not done.

The appellant contends, however, that the five-year limitational period was waived by a subsequent parol

---

* The parties have raised the questions of the right of a tenant in common to sell coal rights without the joinder of the co-tenant and the applicability of the Statute of Frauds. It is unnecessary to consider these questions because the appeal has been decided on other grounds as indicated in the opinion.

agreement. He testified at the board of viewers hearing that when he told Paul Ciaffoni he would have difficulty in getting started within the 60-day period and asked him if "it was all right with him," Ciaffoni replied: "Why certainly, just go take the coal out and pay me the royalty, that is all you got to do. It doesn't make any difference how soon you start and how soon you get through, but the quicker you get through, the better I like it."

It is obvious that this kind of an assurance is not enough to overcome the solemn commitment in writing that the coal was to be got out within five years. Ciaffoni also said, according to Gloeckner, that the coal could be "taken out to exhaustion." But the original agreement also provided for removal of the coal to exhaustion, however always within five years, so that the use of this phrase in the oral conversation did not change the original intention specifically spelled out in the original lease.

In *Knight v. Gulf Refining Co.*, 311 Pa. 357, this Court said: "The existence of an oral contract changing the terms of a prior written one must be clearly and positively shown. Its terms must appear definitely from the evidence . . . the mere suggestion or possibility of a contract arising from transactions between the parties is not enough; there must be evidence authorizing more than a conjecture or surmise."

An oral contract changing the terms of a written contract must be of such specificity and directness as to leave no doubt of the intention of the parties to change what they had previously solemnized by a formal document. The oral evidence must be of such a persuasive character that it moves like an ink eradicator across the written paper, leaving it blank so that the parties in effect start afresh in their negotiations and mutual commitments. The testimony of Gloeckner fell far short of such persuasiveness. On the contrary,

it was vague, elusive, ambiguous and entirely devoid of eradicating or even modifying characteristics.

And then, even if in an extreme hypothesis a conclusion could be reached that Ciaffoni agreed to extend the time of the lease, nothing was submitted in the way of evidence to establish that the extension could last for the period of time now retroactively desired by the appellant. The most that could be expected is that the extension would be one for a reasonable period of time. It will be recalled that Gloeckner quoted Ciaffoni as saying "the quicker you get through, the better I like it." How quickly did Gloeckner get through? The supposed extension was authorized in 1947. By 1958 Gloeckner had not withdrawn a bucketful of coal.

In *Thomas v. Thomas Flexible Coupling Co.*, 353 Pa. 591, this Court said: "Where there is no express provision in a contract as to its duration the intention of the parties in that regard is to be determined from the surrounding circumstances and by the application of reasonable construction to the agreement as a whole."

Would a reasonable construction extend the contract for eleven years? If the appellant argues that the benefits accruing to Ciaffoni in the way of consideration was his expectation of royalties, how long should he reasonably await royalties? The rule applicable in cases involving time to search for, develop and work premises for minerals other than oil and gas, is stated in 76 A.L.R. (2) 725n as follows: "Where the principal consideration to the lessor is his expectation of receiving royalties, there is an implied obligation on the part of the lessee diligently to explore, develop and work (mine) the premises so that the lessor may obtain the expected income that induced him to grant the lease."

According to his own testimony, Gloeckner did not mine diligently. According to his own testimony,

Gloeckner did not mine. On what possible plateau of reasoning may he indolently tarry eleven years while the cobwebs of inactivity form over the mining operation, and still expect all parties involved to await his pleasure?

When Gloeckner received the alleged extension of time, he placed it on the shelf of procrastination to gather the dust of indifference and neglect. While it is true that some things improve with age, an oral agreement to modify a written agreement is emphatically not one of them. If procrastination is the thief of time, as the philosophers moralize, it is also the pillager and despoiler of rights, privileges and prerogatives. So that even if it be assumed that Gloeckner acquired the right not to be held strictly to the strict letter of the lease of 1947, when he conversed with Ciaffoni, that right dissolved in the sluggishness of his own lethargy.

In the case of *Wilmore Coal Co. v. Brown,* 147 F. 931, the lessee-defendant did nothing for some 25 years. The court said: "He has simply stood by and held on endeavoring at times to interest others who would do something, and in a few instances selling and disposing of his rights for a consideration . . . The original lessors, evidently despairing of any results from his direction, and in some instances with a declared object of getting rid of the incubus of these leases have sold out to others by whom these developments have been effected and the mining of coal extensively produced. Under the circumstances, the rights granted to the defendant by the leases in controversy must be regarded as relinquished and abandoned."

The leases in the *Wilmore* case were to run for 99 years, so that if a delay of 25 years in a 99-year lease was enough to work a legal abandonment, certainly a delay of 11 years in a five-year lease would be more than enough to evince an abandonment amounting to a deliberate casting overboard of all intention to fulfill the terms of the lease.

Applying the above indicated rules to the facts in the instant case, as revealed by the plaintiff himself, the conclusion is inescapable that a reasonable period of extension had expired long before the condemnation of 1958 and that, therefore, Gloeckner was not entitled to any damages resulting from the condemnation.

The action of the parties themselves buttress this conclusion.* The lessee did not mine, he paid no royalties, he took no action under the lease. The lessor, four years prior to the condemnation, entered into another lease, duly placed of record, covering the same object with Lapaglia Contractors, Inc. When this happened Gloeckner made no effort to recover the rights he had cast into the ocean of his own neglect.

Judgments affirmed.

---

* *Peoples Natural Gas Co. v. Braddock Wire Co.*, 155 Pa. 22.