346 S.E.2d 749

**TROY MINING CORPORATION**

v.

**ITMANN COAL COMPANY.**

No. 16729.

Supreme Court of Appeals of West Virginia.

March 20, 1986.

Dissenting Opinion July 12, 1986.

Martin J. Glasser, John A. Rollins, Lewis, Ciccarello, Masinter & Freidberg, Charleston, for appellant.

W. Warren Upton, Robert G. McLusky, Jackson, Kelly, Holt & O'Farrell, Charleston, for appellee.

BROTHERTON, Justice:

In this case, Troy Mining Corporation complains that the Circuit Court of Wyoming County erroneously directed a verdict in favor of Itmann Coal Company, in a suit for wrongful termination of a contract mining agreement. The main issues in the case are whether the contract between the parties, or a seven-day mutual termination clause therein, was unconscionable, and, alternatively, whether there had been an oral modification of the contract. We find no error in the proceedings, and for reasons set out below, affirm the judgment of the circuit court.

Troy Mining Corporation is the successor to V & R Coal Company. Because V & R Coal Company was the relevant entity during the period in issue, Troy Mining and its predecessors will be referred to herein as "V & R." V & R was a corporation that operated as a contract miner of coal for Itmann Coal Company in Wyoming County, West Virginia, from 1973 until its contract was terminated by Itmann on August 8, 1980.

During the period that V & R was in operation, Itmann also operated three deep mines of its own, and had ongoing contracts with nine to ten other contract mining companies. Itmann was owned jointly by Consolidation Coal Company, National Steel Corporation, Bethlehem Steel Corporation, and Dominion Foundries and Steel, Ltd. It was managed by Consolidation Coal Company, and its market was controlled by its four owners. Most of Itmann's production went to the three steel companies, and Consolidation Coal Company also purchased some of Itmann's coal for resale.

V & R and Itmann operated under three successive written mining agreements, executed in September, 1973, January, 1976, and November, 1979. The contracts were similar in their terms, each providing, among other things, that: V & R would mine on property owned by Itmann, and deliver all its production to Itmann; V & R would maintain a minimum production capacity (300 tons per day in the 1979 agreement), although Itmann was not required to purchase any minimum amount; Itmann could, at its option, purchase all equipment owned by V & R upon termination of the contract; and the contract could be terminated at any time without cause by either party upon seven days' written notice. The 1979 contract provided for a five-year term.

The dispute centers around the execution of the November, 1979 contract, and its termination by Itmann in August, 1980. In the fall of 1979, Itmann prepared new contracts for all its contract miners. Mike Ashcraft, an officer of Itmann, and also an employee of Consolidation Coal Company, received the final versions of these contracts in November, 1979, and was instructed to have them executed as soon as possi-

ble, and to withhold checks due to contract miners until they signed the new contracts. All of the 1979 agreements, like the previous two contracts signed by V & R, included a provision allowing termination on seven days' notice, with or without cause.

The principals of V & R testified that the contract was signed under pressure, but V & R did not claim fraud or duress. Two officers of the company said that they were forced to sign before receiving a check they needed to meet an upcoming payroll, and that they were not allowed to take a copy of the contract to be reviewed by their attorneys. Itmann, however, introduced the cancelled check that V & R claimed was withheld. The endorsement on the back of the check showed that it was negotiated a day before the date on the contract. Witnesses for both sides testified that the contract was signed Wednesday, November 28, 1979, and the date on the endorsement was November 27, 1979.

V & R also alleged that soon after the 1979 contract was executed Itmann requested increased production, represented that it would be able to purchase increased tonnage for the foreseeable future, and promised that if the ash content of V & R's coal got too high, Itmann would provide V & R with another site to mine. Relying on these representations, V & R borrowed $250,000 in February, 1980, which was used to purchase and refurbish used mining equipment, including two shuttle cars, a power center, and a continuous miner, and to carry the company through a three-week shutdown in March, 1980, for installation of the newly purchased equipment. Thereafter, from April, 1980, until termination of the contract in August, 1980, V & R produced an average of 445 tons per day, which was a 45% increase over its previous coal production.

V & R produced at the elevated level for approximately four months. On August 8, 1980, Itmann sent a letter to V & R stating that its contract would be terminated in

seven days and that it did not elect to purchase V & R's equipment on site. As a result of the termination, V & R discontinued operations.

V & R, by its successor, Troy Mining Corporation, thereafter sued Itmann in the Circuit Court of Wyoming County, claiming that the contract was unconscionable due to the seven-day termination clause, and that the contract had been orally modified so as to make Itmann's termination of the contract wrongful. The case was presented to a jury in a trial that lasted four days. On a motion by counsel for the defense at the conclusion of all the evidence, Judge A.R. Kingdon directed a verdict for the defendant, Itmann Coal Company. V & R appeals to this Court, asking that we reverse the judgment of the trial court and enter judgment for V & R, or, in the alternative, remand for a new trial.

## I.

We address first V & R's claim that the seven-day termination clause in the contract mining agreement was unconscionable. Unconscionability is an equitable principle, and the determination of whether a contract or a provision therein is unconscionable should be made by the court. *See* Comment 3, W.Va.Code § 46-2-302 (1966);[1] *Warner v. Kittle*, 167 W.Va. 719, 280 S.E.2d 276, 280 (1981). We are not, therefore, confronted with the question of whether this issue should have gone to the jury, but only whether the trial court's determination was in error.

According to the record, Judge Kingdon determined that the provision was not unconscionable because it was a mutual term, and one which could reasonably be foreseen to benefit either party. All the testimony adduced at trial indicates that mutual termination on short notice is a common, or even standard, provision in a contract mining agreement. It gives the purchaser of coal the ability to stop production if it has

---

1. Although § 46-2-302, as part of the "Sales" article of the Uniform Commercial Code, by its own terms applies only to the sale of goods, and the contract in this case was for services, this Court has noted that the common law concept of unconscionability is largely the same as that articulated in the Uniform Commercial Code. *McMellon v. Adkins*, 171 W.Va. 475, 300 S.E.2d 116, 119 n. 1 (1983). *See generally* Restatement (Second) of Contracts § 208 comment a (1979).

no market for the coal, and it gives the contract miner the ability to discontinue mining if he can't make his costs.

The transcript also shows that the principals of V & R were familiar with contract provisions of this kind, and knew how to use them to their advantage. The same clause can be found in the 1973 and 1976 contracts between V & R and Itmann. Darrell Young, one of the owners of V & R and its business manager, testified that he and the other principals of V & R had terminated an earlier venture after only a month of operation when they hit a fault and could not economically continue to mine. He also testified that a company he organized after termination of the Itmann contract entered into a contract with Elk Run Coal Company which allowed termination by either party without cause on 30 days' notice, and that Elk Run terminated under that provision. The evidence indicates that seven-day mutual termination provisions were included in all Itmann's contracts with its contract miners and in Consolidation Coal Company's contracts with contract miners in this region. Further, contract miners had used such termination clauses to their benefit against both Itmann and Consolidation Coal.

■ This evidence of common business usage, potential benefit to either party, and actual benefit to parties similarly situated on both sides indicates that the provision was not "so one-sided as to lead to absurd results." The latter is the standard set out by this Court in syllabus point 2 of *Ashland Oil, Inc. v. Donahue*, 159 W.Va. 463, 223 S.E.2d 433 (1976), for finding a termination provision unconscionable.[2] In that case, a "franchisee" entered into both a gas station lease and a dealer contract with a large oil company. The lease had a one-year term that was automatically renewed, but could be cancelled by either party on 10 days' written notice, either during or at the end of the term. The dealer contract had a similar, renewable one-year term, and could be cancelled by either party at the end of

the term on 60 days' notice. The dealer contract had an additional provision, however, that allowed Ashland to terminate at any time on 10 days' notice if the dealer did anything that, in Ashland's sole judgment, tended to impair Ashland's good name or reputation. 159 W.Va. at 466, 223 S.E.2d at 436. The Court read the two agreements together as forming an integrated business relationship, and concluded that the termination provisions of the lease and the dealer contract could not be reconciled in a way that would express an intention that the parties could reasonably have contemplated. 159 W.Va. at 470, 223 S.E.2d at 438. If, for example, Ashland were to exercise the 10-day termination provision in the lease early in the annual term of the dealer contract, Donahue would have no gas station, but nevertheless would be obliged to purchase and accept delivery of gasoline under the dealer contract until he could cancel at the end of the term.

The contract in this case presents the specter of no such absurd result. The seven-day termination provision was mutual, and could reasonably be foreseen to benefit either Itmann or V & R. We therefore, find no error in the trial court's determination of this issue.

## II.

■ V & R also argues on appeal that the circumstances in which the 1979 contract were executed raise a separate issue of "procedural unconscionability," or overall unconscionability based on unfairness or inequities in the bargaining process. Although this distinction is useful for analyzing cases in which courts have found contracts unconscionable, we do not see it as an entirely separate "second bite" at the unconscionability apple. Whether a particular term in a contract is unconscionable often depends on the circumstances in which the contract was executed or the fairness of the contract as a whole, and therefore our analysis necessarily includes an inquiry beyond the face of the contract.

---

**2.** Syllabus point 2 in its entirety reads: "Termination provisions of an agreement involving the sale of goods which, if applied strictly, are so one-sided as to lead to absurd results, will be declared unconscionable."

As stated by the drafters of the Uniform Commercial Code:

> The basic test [for unconscionability] is whether, *in the light of the general commercial background and the commercial needs of the particular trade or case,* the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract.

W.Va.Code § 46–2–302 comment 1 (emphasis added). Similarly, the Restatement (Second) of Contracts includes this comment:

> A bargain is not unconscionable merely because the parties to it are unequal in bargaining position, nor even because the inequality results in allocation of risks to the weaker party. But gross inadequacy in bargaining power, together with terms unreasonably favorable to the stronger party, may confirm indications that *the transaction* involved elements of deception or compulsion or may show that the weaker party had no meaningful, no real alternative, or did not in fact assent or appear to assent to the *unfair terms.*

Restatement (Second) of Contracts § 234 comment d at 111 (Tent. Draft. No. 5, 1970) (emphasis added), quoted with approval in *John W. Lodge Distrib. Co. v. Texaco, Inc.,* 161 W.Va. 603, 608 n. 2, 245 S.E.2d 157, 160 n. 2.

■ We believe, and these authorities confirm, that the question of "procedural unconscionability" is an essential part of any determination of whether a particular clause or contract is unconscionable. A finding that the transaction was flawed, however, still depends on the existence of unfair terms in the contract. A litigant who complains that he was forced to enter into a fair agreement will find no relief on grounds of unconscionability. The evidence shows that two officials of V & R read the contract, and, by their own testimony, "didn't miss much." The termination clause was the same as that in the previous two contracts, and therefore was not forced on V & R as any sort of deception. As for compulsion, the trial judge, after hearing all the evidence, and having in his hands the cancelled check that negated V & R's claim that their money was withheld, decided that there was no unconscionability.

This Court has noted before that it is not the province of the judiciary to try to eliminate the inequities inevitable in a capitalist society:

> In most commercial transactions it may be assumed that there is some inequality of bargaining power, and this Court cannot undertake to write a special rule of such general application as to bargaining advantages or disadvantages in the commercial area, nor do we think it necessary that we undertake to do so.

*Ashland Oil, Inc. v. Donahue,* 159 W.Va. 463, 474, 223 S.E.2d 433, 440 (1976). Contracts for coal necessarily are designed to take into account downturns in a market that is conceded by all to be volatile. As we look at the facts of this case, the timing of the termination was unfortunate, but was not the result of an unconscionable bargain. V & R extended its credit in reliance on the continuation of a good coal market, and the timing of the termination of its contract, in retrospect, seems unfair. The determination as to unconscionability, however, must be made as of the date of execution, Restatement (Second) of Contracts § 208 (1979),[3] and we see no compelling evidence that any unfair provision was forced upon V & R at that time. We must, therefore, uphold the determination of the trial court.

## III.

■ The next issue, whether the written contract was modified so as to preclude termination under the seven-day provision, presents a more difficult question, because it is an issue which ordinarily would be determined by the jury and not by the court. Our inquiry in reviewing the direct-

---

**3.** *See also Sinkoff Beverage Co. v. Jos. Schlitz Brewing Co.,* 51 Misc.2d 446, 273 N.Y.S.2d 364 (1966) (in determining whether ten days' notice to cancel a distributorship contract was unconscionable, court would not consider plaintiff's subsequent expansion and expenses incurred in reliance on continued relationship with defendant).

ed verdict on this issue is whether the evidence on behalf of V & R was clearly insufficient to support a verdict in its favor, *i.e.*, whether, in the event that the jury had returned a verdict in favor of V & R, the judge would have been obliged to enter a judgment notwithstanding the verdict. *See* syl. pt. 5, *Sommerville v. Pennsylvania R.R. Co.*, 151 W.Va. 709, 155 S.E.2d 865 (1967). When asking this question, we must view the evidence in the light most favorable to V & R. *See, e.g., Lambert v. Goodman*, 147 W.Va. 513, 129 S.E.2d 138 (1963). *Cf.* syl. pt. 2, *Arcuri v. Great Am. Ins. Co.*, 176 W.Va. 211, 342 S.E.2d 177 (1986) (on motion for directed verdict after opening statements, reasonable doubts and inferences must be resolved in favor of party against whom directed verdict is sought).

At trial, V & R advanced a theory of oral modification of the written contract based on three meetings that allegedly occurred between November 28, 1979, and December 31, 1979. Darrell Young and James Johnson, owners and officers of V & R, both testified that they met first with Wesley McDonald, who was Consolidation Coal Company's Vice President in the region, in Pocahontas, Virginia, on the same day that they signed the contract in issue, November 28, 1979. At that meeting, both Young and Johnson testified that they expressed concern about the high ash content of their coal, and that McDonald told them his company would have another site for them to mine if their rejects became too high. McDonald, when called to the stand by Itmann, testified that he had been transferred to Moundsville effective November 1, 1979, and was in Moundsville on November 28, the day of the alleged meeting. Itmann introduced an organizational bulletin documenting this transfer. McDonald denied either having met with Young and Johnson or having made the assurances alleged.

Young and Johnson each testified further that they met twice with James Beard, Vice President of Operations of Itmann, to discuss the market for additional coal if V & R increased its production capacity. At the first meeting, in early December, 1979,

Young testified that he asked Beard what would happen to V & R if Itmann couldn't sell as much coal as it had anticipated. Young said that he told Beard at this meeting that he would have to invest quite a bit of money to increase production, and needed some assurance that V & R would be able to make the payments. Beard, according to Young, replied that sales should be of no concern, because the companies that owned Itmann were obligated to purchase 79% of Itmann's production as determined in a planning meeting near the end of each year, and, "Don't you think we're smart enough to make 79% equal 100%?" James Johnson testified that he attended part of this meeting, and echoed Young's account.

Both men also testified that they requested a meeting with Beard soon thereafter at the mine site. V & R had applied for a loan from Flat Top National Bank in Bluefield, West Virginia, and Flat Top had requested something in writing indicating that V & R had a market for its coal. Young asked Beard for a letter to that effect. He testified that he also inquired about what would happen if the ash content of V & R's coal got so high that it was not economical to mine. Beard, according to Young, said that V & R was the oldest company on the property, and that Itmann would have another place for V & R to mine. Johnson testified that he stopped by during the conversation at the mine site, but did not hear the discussion of the letter or the ash. Beard prepared a letter for Flat Top National Bank, which is quoted in full below:

Dear Mr. Johnson:

This letter is to confirm our conversation about the purchase of two shuttle cars for V & R Coal Company.

If the market conditions continues (sic) to be as good in the future as they have been in the past few months, we will be able to handle the additional increase in tonnage, we realize you need the shuttle cars to go to two production shifts.

If we can be of further help, please feel free to call on us.

Sincerely yours,

Frank Beard

Frank Beard testified that he was not informed about the purchase of any equipment other than the shuttle cars, which V & R bought used from Consolidation Coal Company for $25,000. He also denied ever having told anyone associated with V & R Coal Company that Itmann could purchase increased production for any specified period of time.

In order to establish an oral modification of a written contract, a party bears the burden of providing "clear and positive evidence" that there was a meeting of the minds on the alteration. Syl. pt. 4, *Bischoff v. Francesa*, 133 W.Va. 474, 56 S.E.2d 865 (1949). Moreover, an oral contract changing the terms of a written contract must be so specific and direct that it leaves no doubt that the parties intended to change what they previously solemnized by formal contract. *See, e.g., Gloeckner v. School Dist.*, 405 Pa. 197, 175 A.2d 73 (1961). *See generally*, 17A C.J.S. Contracts § 377 (1943). And, even when that burden has been met, the new contract will be held to depart from the first only to the extent that its terms are inconsistent with the written document. *Wyckoff v. Painter*, 145 W.Va. 310, 316, 115 S.E.2d 80, 84 (1960), *citing Sanford v. First City Co.*, 118 W.Va. 713, 721, 192 S.E. 337, 341 (1937).

Read in the light most favorable to V & R, the jury could have found that officials of Itmann and Consolidation Coal Company told V & R that Itmann had a guaranteed market for any additional tonnage V & R could produce, and that V & R's contract would not be cancelled solely because the ash content of its coal was too high. Leaving aside for the moment whether the evidence was "clear and convincing," these conversations and understandings simply do not add up to a "specific and direct" oral contract clearly intended to alter the written agreement. V & R presented no evidence that the written contract was even mentioned in any of the three meetings on which the theory of modification is based. No reference was made to a specific number of tons, or to a specific period of time. The written agreement had been signed less than a month when V & R asserts there was a modification.

The only piece of writing associated with the alleged modification documents the anticipation of increased tonnage, but makes it clear that Itmann's ability to purchase additional coal was explicitly contingent on the continuation of good market conditions. Frank Beard's letter reads, "If the market conditions continues to be as good in the future as they have been in the past few months, we will be able to handle the additional increase in tonnage...." Any reliance on such statements as guaranteeing a perpetual market for V & R's coal was simply unreasonable.

Even if we were to assume that the case should have gone to the jury on the issue of whether the evidence showed a clear and positive meeting of the minds, Judge Kingdon would have properly directed a verdict, because the modifications alleged would have changed only the term of the agreement (five years, as written) and possibly the production requirements (already stated as a "minimum" production capacity of 300 tons per day). These modifications leave intact Itmann's ability to refuse to accept coal on any given day and for an unrestricted duration,[4] and its ability to cancel the contract, without cause, on seven days' notice. There was no testimony at the trial that anyone ever discussed the termination clause. It is argued on appeal that the termination clause was deleted by implication, because it was inconsistent with other terms of the contract as modified. It does not appear to this Court,

---

4. Itmann was bound by the contract to accept only whatever coal it requested. The record reflects that Itmann refused to accept coal from V & R on numerous occasions. When this happened, V & R would stockpile the coal at the mine site until Itmann could take it. Not infrequently, Itmann would advance money to its contract miners, secured by their stockpiles, and the memoranda documenting the advances cited "market conditions" as the reason. V & R thus was aware that, even if the contract were to continue in effect, it had no guarantee that Itmann would accept coal. In fact, it had a good basis for understanding that Itmann's ability to purchase was dependent on its ability to sell the coal at a profit.

however, that the seven-day termination provision was any more inconsistent with the term as V & R alleges it had been modified than it was with the five-year term agreed upon in the written contract.[5]

To summarize, the evidence adduced at trial could, when read in the light most favorable to V & R, support a jury finding that the agreement was modified to provide for an extended term and for increased production capacity. There is no evidence, however, to support a finding that the termination provisions of the contract were altered, or that Itmann assumed an obligation to purchase coal regardless of its ability to sell it. We conclude, therefore, that the circuit judge, finding the evidence insufficient to support a verdict in the plaintiff's favor, properly directed a verdict for the defendant, Itmann Coal Company.

For the reasons set out above, we affirm the judgment of the Circuit Court of Wyoming County.

Affirmed.

McGRAW, Justice, dissenting:

The majority's disposition of the modification issue in this case directly conflicts with the most fundamental principles of contract law. Evidence of this conflict is reflected in its admission that, "[W]hether the written contract was modified so as to preclude termination under the seven-day provision, presents a more difficult question, because it is an issue which ordinarily would be determined by the jury and not by the court." Inevitably, when courts endeavor to usurp the fact-finding function of the jury, feelings of inadequacy are expressed as recognition of the difficulty of the issue presented. Treading in unfamiliar territory, courts faced with this conflict often resort to obfuscation to achieve the desired result.

In *W.L. Thaxton Const. Co. v. O.K. Const. Co.*, 170 W.Va. 657, 295 S.E.2d 822, 825 (1982), this Court recognized, "It was for the jury to decide if the written and signed contract had been orally modified ...." This observation conforms to the general rule throughout the country that whether a written contract has been modified by oral agreement is a question of fact for the jury. *See Litman v. Massachusetts Mutual Life Ins. Co.*, 739 F.2d 1549, 1557 (11th Cir.1984); *Commercial Contractors, Inc. v. U.S. Fidelity & Guaranty Co.*, 524 F.2d 944, 952 (5th Cir.1975); *General Ins. Co. v. Hercules Const. Co.*, 385 F.2d 13, 19 (8th Cir.1967); *Palmiero v. Spada Distributing Co.*, 217 F.2d 561, 566 (9th Cir.1954); *Reiver v. Murdoch & Walsh, P.A.*, 625 F.Supp. 998, 1010 (D.Del. 1985); *Magill v. Westinghouse Electric Corp.*, 327 F.Supp. 1097, 1108 (E.D.Pa. 1971), *aff'd*, 464 F.2d 294 (3d Cir.1972); *Lightsey v. Orgill Bros.*, 454 So.2d 1002, 1005 (Ala.Civ.App.1984); *Linda Elenia Askew Trust v. Hopkins*, 15 Ark.App. 19, 23–24, 688 S.W.2d 316, 318 (1985); *Grove v. Grove Valve & Regulator Co.*, 4 Cal. App.3d 299, 313, 84 Cal.Rptr. 300, 308 (1970); *Uinta Oil Refining Co. v. Ledford*, 125 Colo. 429, 432, 244 P.2d 881, 884 (1952); *Three S. Development Co. v. Santore*, 193 Conn. 174, 177–179, 474 A.2d 795, 798 (1984); *Norair Engineering Corp. v. Port-*

---

5. Judge Kingdon also indicated that the oral modification, if there was one, would have been void by operation of the statute of frauds, W.Va. Code § 55-1-1 (1981), which requires all contracts not capable of performance within one year to be in writing. *See, e.g., Thompson v. Stuckey*, 171 W.Va. 483, 300 S.E.2d 295, 298 (1983). Because we agree with the trial court that the evidence was insufficient to support a finding that there was a modification, it is not necessary to address here the application of the statute of frauds.

Similarly, the trial court discussed a third ground for directing a verdict, which was that the evidence of damages introduced by V & R

was too speculative to support an award. At trial, V & R introduced considerable evidence of its *gross* profits in 1979, seeking to establish a figure representing profit per ton or per day of mining on which the jury could base a calculation of lost profits. Itmann attacked this evidence on the grounds that *net* profit is the relevant figure, *see, e.g., Addair v. Motors Ins. Corp.*, 157 W.Va. 1013, 207 S.E.2d 163 (1974), and that even net profits depended on an assumption that Itmann would continue to purchase coal, which it was not required to do under the contract. Again, we need not reach this issue, because we have determined that V & R had no right to recover.

*er Trucking Co.,* 163 Ga.App. 780, 784, 295 S.E.2d 155, 158 (1982); *Resource Engineering, Inc. v. Siler,* 94 Idaho 935, 938, 500 P.2d 836, 839 (1972); *Stonecipher v. Pillatsch,* 30 Ill.App.3d 140, 143, 332 N.E.2d 151, 154 (1975); *Davenport Osteopathic Hospital Ass'n v. Hospital Service, Inc.,* 261 Iowa 247, 253, 154 N.W.2d 153, 157 (1967); Syl. pt. 2, *Coonrod & Walz Const. Co. v. Motel Enterprises, Inc.,* 217 Kan. 63, 535 P.2d 971 (1975); *University National Bank v. Wolfe,* 279 Md. 512, 523, 369 A.2d 570, 576 (1977); *L.W. Severance & Sons v. Angley,* 332 Mass. 432, 438, 125 N.E.2d 415, 419 (1955); *Green v. Pendergraft,* 253 Miss. 891, 900, 179 So.2d 831, 836 (1965); *Gallizzi v. Scavo,* 406 Pa. 629, 179 A.2d 638, 646 (1962); *Stowers v. Harper,* 376 S.W.2d 34, 39 (Tex.Civ.App.1964).

The purchaser in this action requested the seller to increase production. In order to increase production, additional equipment was needed. In order to purchase additional equipment, additional capital was needed. In order to receive additional capital, in the form of a loan, a guarantee that the purchaser would absorb the increased production was needed. The purchaser, desirous of increased production, represented to both the seller and the bank that it would purchase any additional tonnage. Relying upon this representation, the bank loaned the seller $250,000. This money was applied to the purchase and renovation of additional equipment, and production increased by 45%. Four months later, after a downturn in the market, the buyer terminated the contract. Granted this scenario, it is absurd to assert that insufficient facts were presented to raise an issue of fact with respect to whether modification of the termination provision was intended by the parties. Thus, I dissent.