**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 24-2051

ROCKWELL MINING, LLC; BLACKHAWK LAND AND RESOURCES, LLC,

Plaintiffs – Appellees,

v.

POCAHONTAS LAND LLC,

Defendant – Appellant.

No. 24-2110

ROCKWELL MINING, LLC; BLACKHAWK LAND AND RESOURCES, LLC,

Plaintiffs – Appellants,

v.

POCAHONTAS LAND LLC,

Defendant – Appellee.

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston.  John T. Copenhaver, Jr., Senior District Judge.  (2:20−cv−00487)

Argued:  October 24, 2025                    Decided:  December 5, 2025

Before DIAZ, Chief Judge, FLOYD, Senior Circuit Judge, and Patricia Tolliver GILES, United States District Judge for the Eastern of Virginia, sitting by designation.

———————————

Affirmed by unpublished opinion. Chief Judge Diaz wrote the opinion, in which Judge Floyd and Judge Giles joined.

———————————

**ARGUED:** J. Thomas Lane, BOWLES RICE, LLP, Charleston, West Virginia, for Appellant/Cross-Appellee. Brian Alexander Glasser, BAILEY & GLASSER, LLP, Charleston, West Virginia, for Appellees/Cross-Appellants. **ON BRIEF:** J. Mark Adkins, Gabriele Wohl, Zachary J. Rosencrance, BOWLES RICE LLP, Charleston, West Virginia, for Appellant/Cross-Appellee. Joshua I. Hammack, Washington, D.C., Laura E. Babiak, Charleston, West Virginia, Benjamin A. Schwartzman, BAILEY & GLASSER, LLP, Boise, Idaho, for Appellees/Cross-Appellants.

———————————

Unpublished opinions are not binding precedent in this circuit.

2

DIAZ, Chief Judge:

In 1937, two sophisticated commercial entities executed a coal mining lease in West Virginia. The lease provides a flat-rate royalty for mined coal and gives only the lessee—now Rockwell Mining, LLC and Blackhawk Land and Resources, LLC—the right to renew. While the royalty rate (ten cents per ton) was commercially reasonable in 1937, it doesn't even cover the current lessor's overhead today. So that lessor, Pocahontas Land LLC, wants to renegotiate the terms. And if it can't, Pocahontas Land wants to terminate the lease, citing breaches of the lease's anti-assignment provision.

The district court held that Pocahontas Land couldn't do either. We agree. The lease's forfeiture provision is too broad under West Virginia law to permit termination for the alleged breaches. And the lease isn't unconscionable, so it can't be reformed on that basis.

We therefore affirm.

## I.

### A.

#### 1.

In 1937, Loup Creek Colliery Company leased ten thousand acres in Wyoming and Boone Counties, West Virginia to the Koppers Coal Company to mine coal. At the time,

3

the Andrew Mellon[1] family largely controlled Koppers Coal's ultimate parent company, the Koppers United Company. And Koppers United owned forty percent of the voting shares of Loup Creek's parent company, the Virginian Railway.

Railroads and coal companies had to make sizeable up-front investments to start new coal mining operations in the area. So this arrangement allowed Koppers United to share in the profits derived from shipping coal on the Virginian Railway.

Loup Creek and Koppers Coal negotiated over the lease terms for six months. The executed lease has four provisions relevant to this appeal.

**Article Three** provides flat-rate royalties for mined coal. The royalty rate is ten cents per ton for the first 500,000 tons of coal mined or shipped in a year, and decreases by one cent for the next 500,000 tons and so on.

**Article Sixteen** prohibits the lease's assignment, mortgage, conveyance, sublet, or underlet without the lessor's consent.

**Article Nineteen**, a general forfeiture clause, provides that if

> . . . the Lessee shall fail in the performance or observance of *any of the terms, conditions, covenants and agreements* herein contained to be performed or observed by it, or shall use the leased premises contrary to the limitations hereof, . . . at the election of the Lessor, the term and leasehold interest hereby created and all rights of the Lessee under this indenture shall

---

[1] American financier Andrew Mellon amassed his fortune when he inherited a successful banking business from his father and invested in a variety of industries, including steel, railway, oil, coal, and electricity. *See* Phillip H. Love, <u>Andrew W. Mellon, The Man and His Work</u> 27–28 (1929). When German inventor Heinrich Koppers needed financial backing to launch his new coal company in the United States, Andrew and his brother Richard Mellon signed on as primary shareholders. The Mellons acquired Heinrich Koppers' company shares after the United States entered World War I in 1917 and owned fifty-five percent of the stock by 1921.

forthwith cease and determine, and the Lessor shall be entitled . . . to re-enter the leased premises and to exclude the Lessee therefrom and to hold the leased premises as of its former estate[.] . . . The remedies given in this Article are merely cumulative, and shall not deprive the Lessor of any other of its legal or equitable remedies.

J.A. 98–99 (emphasis added).

Finally, **Article Twenty-Three** gives the lessee the unilateral right to renew the lease every twenty years until all the coal has been mined or removed.[2]

2.

Pocahontas Land succeeded Loup Creek as the lessor in 1965. And Rockwell acquired its rights as lessee through a bankruptcy transfer in 2015. The parties amended the 1937 lease later that year. That amendment expanded Article Sixteen's anti-assignment provision, specifying that:

a transfer of control of the lessee therein shall be an event of assignment requiring Poca[hontas] Land's consent, and shall be deemed to have occurred *whenever 50.1% or more* of the lessee's capital stock or membership interests shall become subject to the direct or indirect control of persons or entities, some or all of whom are different than those persons or entities which directly or indirectly control that portion of the lessee's capital stock or membership interests as of the effective date of this Consent.

J.A. 133 (emphasis added).

The lease has changed hands several times between 1937 and 2021, but only twice with Pocahontas Land's explicit consent. Two of the more recent transfers of control without consent are at issue here.

---

[2] The lease has been continuously renewed, and the current term expires in 2037.

5

*First*, in July 2019, Blackhawk Mining LLC—Rockwell and Blackhawk Land's parent company—filed a Chapter 11 voluntary petition for reorganization. As part of the exit financing, Blackhawk Mining entered into two credit agreements in January 2020, and Rockwell pledged the 1937 lease as collateral under two deeds of trust.[3] Rockwell didn't obtain Pocahontas Land's consent. Two months later, Pocahontas Land notified Rockwell in writing that it was in default of Article Sixteen by mortgaging the leasehold without consent.

*Second*, in June 2020, Blackhawk Mining merged with another company. Blackhawk Mining notified Pocahontas Land one day before the parties signed the transaction but didn't obtain Pocahontas Land's consent. Pocahontas Land sent another default notice to both Rockwell and Blackhawk Land, claiming that the 2015 Amendment mandated its consent "for a direct or indirect change of control." J.A. 683.

B.

Rockwell sought a declaratory judgment that the 2020 merger didn't require Pocahontas Land's consent and therefore didn't breach the 1937 lease. Pocahontas Land filed three counterclaims, seeking its own declaratory judgment that: (1) Article Three's flat-rate royalty provision is unconscionable and subject to reformation or termination;

---

[3] The deeds of trust contain "savings clauses" which provide: "Notwithstanding anything to the contrary contained herein, this Mortgage shall not constitute an assignment or encumbrance on or of any Mortgaged Leases within the meaning of any provision thereof prohibiting its assignment or encumbrance[.]" J.A. 191, 235. We needn't consider the validity of these clauses—as presented in the cross-appeal—because we affirm the district court's order on remedies.

(2) Article Sixteen's consent requirement, as amended by the 2015 Amendment, is enforceable and Rockwell's failure to obtain consent for the 2020 merger breached the lease; and (3) Article Sixteen's prohibition against mortgages is enforceable and Rockwell's failure to obtain consent for the 2020 mortgage also breached the lease.

The parties cross-moved for summary judgment. The district court granted summary judgment to Rockwell on Pocahontas Land's unconscionability counterclaim, finding no procedural unconscionability. It granted partial summary judgment to Pocahontas Land on the remaining counterclaims, concluding that both the January 2020 mortgage and the June 2020 merger breached Article Sixteen's anti-assignment provision. But the court denied Pocahontas's request for forfeiture or reformation.

This appeal followed.[4]

## II.

We review de novo a district court's grant of summary judgment. *See Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 817 (4th Cir. 1995). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movement is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

---

[4] Rockwell cross-appeals the district court's order on the two breaches, contending that neither the 2020 mortgage nor the 2020 merger were in fact breaches. But we needn't reach these issues since we agree with the district court that neither forfeiture nor reformation is available.

III.

We begin with Pocahontas Land's forfeiture request.

West Virginia law doesn't favor forfeiture. *Bethlehem Steel Corp. v. Shonk Land Co.*, 288 S.E.2d 139, 142 (W. Va. 1982). But its courts recognize two potential avenues to obtain that extraordinary remedy.

First, an underlying contract may expressly permit forfeiture for the specific breach at issue. *Id.* Second, a party's "extraordinary hardship" may permit equitable forfeiture when there's no adequate remedy at law. *Allen v. Colonial Oil*, 115 S.E.842, 845 (W. Va. 1923); *Truby v. Broadwater*, 332 S.E.2d 284, 285 (W. Va. 1985).

Pocahontas Land can't succeed on either theory.

A.

Pocahontas Land can't pursue contractual forfeiture because the 1937 lease doesn't permit forfeiture for the breach in question. "The right to forfeit must be clearly stipulated for in terms, else it does not exist." *Bethlehem Steel*, 288 S.E.2d at 142.

Article Nineteen's general forfeiture provision isn't sufficient because it allows forfeiture as a remedy if the lessee " fail[s] in the performance or observance of *any* of the terms, conditions, covenants and agreements herein." J.A. 98–99 (emphasis added). It's "[a] catchall, dragnet forfeiture clause for breach of *any* contractual covenant," which doesn't "meet the strict standards for valid forfeiture clauses" under West Virginia law. *Bethlehem Steel*, 288 S.E.2d at 143 (emphasis added).

To be enforceable, Article Nineteen would have to expressly permit forfeiture as a remedy for the breached provision: Article Sixteen (the assignment-consent provision).

8

*See id.* ("The broken covenant or condition relied upon for forfeiture must be found . . . within the forfeiture clause.") (emphasis omitted).  Or Article Sixteen itself would have to provide forfeiture as a remedy.[5]  The lease does neither.

### B.

Pocahontas Land's equitable forfeiture arguments fare no better.

### 1.

Pocahontas Land contends that "a core basis for denying forfeiture"—both in *Bethlehem Steel* and the cases that follow—"is the condition that monetary damages, or that other relief, like nonrenewal of the lease in *Bethlehem*, will suffice."  Appellant's Br. at 28; *see Bethlehem Steel*, 288 S.E.2d at 142 (finding forfeiture unavailable because the lessor "can be made whole by monetary damages *and* by allowing it not to renew the lease").  And here, Pocahontas Land can't point to monetary damages or bar renewal of the lease, given Article Twenty-Three's unilateral renewal provision.  So Pocahontas Land argues that "equity favors forfeiture."  Appellant's Br. at 29.

But the 1937 lease doesn't *preclude* monetary damages outright.  Article Nineteen says that "[t]he remedies given in this Article are merely cumulative, and shall not deprive the Lessor of any other of its legal or equitable remedies."  J.A. 99.

---

[5] Article Twelve, for example, which deals with mine surveys and maps, includes a forfeiture clause: If the Lessee fails to comply with that Article's specific provisions, "the Lessor may at its option cancel and annul this lease."  J.A. 95.

True, Pocahontas can't prove any damages here. But that doesn't mean they aren't available under the lease. We won't permit such extraordinary equitable relief when an adequate legal remedy exists. *E.g.*, *Truby*, 332 S.E.2d at 285.

2.

Nor do any other equity principles warrant forfeiture.

"[I]ndifference, laches, and injurious conduct of the lessee" may permit equitable forfeiture. *Warner v. Haught*, 329 S.E.2d 88, 96 (W. Va. 1985) (citation omitted). But such conduct must cause the lessor "extraordinary hardship." *Allen*, 115 S.E. at 845.

West Virginia courts have found such hardship and permitted equitable forfeiture (or partial rescission) where the lessee misused or abandoned the land. *See e.g.*, *Adkins v. Huntington Dev. & Gas Co.*, 168 S.E. 366, 369 (W. Va. 1932) (permitting forfeiture of oil and gas lease where lessee fraudulently drained gas through wells on adjacent property); *St Luke's United Methodist Church v. CNG Dev. Co.*, 663 S.E.2d 639, 641 (W. Va. 2008) (permitting *partial* rescission of oil and gas lease where lessee underdeveloped property); *Lowther Oil Co. v. Miller-Sibley Oil Co.*, 44 S.E. 433, 435 (W. Va. 1903) (recognizing that "[u]nder some circumstances of delay or fraudulent evasion of duty of development, equity will cancel an oil lease"). So too, a lessee's repeated failure to pay rent on time may justify equitable forfeiture. *Warner*, 329 S.E.2d at 96.

But here, there's no evidence that the coal isn't being mined or that the lessor isn't being paid. Rather, the breaches involve lease assignments without the lessor's consent.

In a case like this, where compensatory damages are theoretically available and any breaches don't concern the land itself, equity doesn't support forfeiture.

10

IV.

Finally, unconscionability.

West Virginia recognizes two types: procedural and substantive.  *See State ex rel. Richmond Am. Homes of W. Va., Inc. v. Sanders,* 717 S.E.2d 909, 920 (W. Va. 2011). "Procedural unconscionability is concerned with inequities, improprieties, or unfairness in the bargaining process and formation of the contract." *Brown ex rel. Brown v. Genesis Healthcare Corp.*, 729 S.E.2d 217, 227 (W. Va. 2012) (*Brown II*) (citation omitted). Substantive unconscionability concerns "unfairness in the contract itself and whether a contract term is one-sided and will have an overly harsh effect on the disadvantaged party." *Id.* at 228 (citation omitted).

Both must be present to make a contract unenforceable, but not necessarily to the same degree.  *Sanders*, 717 S.E.2d at 920.  West Virginia courts use a "sliding scale" approach in assessing unconscionability: "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the clause is unenforceable, and vice versa." *Id.* (citation omitted).

A.

First, procedural unconscionability.

On this issue, we ask whether there was a "real and voluntary meeting of the minds of the parties at the time that the contract was executed." *Brown ex rel. Brown v. Genesis Healthcare Corp.*, 724 S.E.2d 250, 285 (W. Va. 2011) (*Brown I*) (cleaned up).

Here, there was.  Koppers Coal and Loup Creek were two sophisticated commercial entities that freely negotiated the lease terms.

11

Pocahontas Land makes much of the "control" the Mellon family purportedly exercised over the original lessor. *See* Appellant's Br. at 37. But that "control" only amounted to forty percent of Loup Creek's parent company's voting stock. And Pocahontas Land doesn't point to any evidence that this voting share meaningfully impacted Loup Creek's ability to negotiate reasonable royalty rates (or any other lease provision).

We aren't convinced that this lease transaction was anything other than "an arms-length negotiation between competent, independent business-persons." *Blackrock Cap. Inv. Corp. v. Fish*, 799 S.E.2d 520, 531 (W. Va. 2017). Nor do we find any other procedural inadequacies concerning age, literacy, or hidden or complex contractual terms. *See Brown I*, 724 S.E.2d at 287.

So we agree with the district court that the lease wasn't procedurally unconscionable.

B.

Next, substantive unconscionability.

The district court didn't reach this issue given "the absence of any procedural unconscionability in the bargaining process." J.A. 1108. We agree that "[t]o be unenforceable, a contract term must—at least in some small measure—be both procedurally and substantively unconscionable." *Horizon Ventures of W. Va. Inc. v. Am. Bituminous Partners*, 857 S.E.2d 33, 40 (W. Va. 2021) (cleaned up). Regardless, Pocahontas Land failed to show any substantive unconscionability, defeating its claim.

12

For substantive unconscionability, we consider whether the terms of the contract "seem[ed] unfair . . . as of the *date of execution*." *Troy Mining Corp. v. Itmann Coal Co.*, 346 S.E.2d 749, 754 (W. Va. 1986) (emphasis added).

Pocahontas Land points to three provisions it thinks are unfair: (1) the royalty rate, (2) the unilateral perpetual renewal, and the (3) unenforceable forfeiture provision. But none persuade.

First, Pocohontas Land hasn't shown that the ten-cent royalty rate was unreasonable in 1937. Quite the opposite: Pocahontas Land's expert concedes that the rate "was fairly representative of coal leases in Southern West Virginia at the time." J.A. 616.

Second, perpetual leases "have long been recognized as valid and binding in [West Virginia]." *Pechenik v. Balt. & Ohio R.R. Co.*, 205 S.E.2d 813, 898 (W. Va. 1974). So that provision isn't unreasonable on its face either.

Third, the forfeiture provision is unenforceable under West Virginia law. *Bethlehem Steel*, 288 S.E.2d at 143. Pocahontas Land can't rely on that clause to support its substantive unconscionability argument.

While the royalty rate and unilateral perpetual renewal terms are fair in isolation, the combination is more troubling. But West Virginia courts haven't declared that such a combination makes for a substantively unconscionable lease. And we won't either.

Pocahontas Land might be stuck in a disadvantageous deal today. But when sophisticated parties enter a fair contract, West Virginia law won't disturb its terms.

Accordingly, the district court's judgment is

*AFFIRMED.*

13